Good morning, Council and our audience in attendance. We will be hearing one case with this panel this morning, and that is a consolidated matter of Coons v. Attorney General and Siegel v. Attorney General, and those will be case numbers 23-1900 and 23-2043. And I believe we're going to be starting with you, Ms. Kite. May it please the Court, I'd like to reserve five minutes for rebuttal. Of course. I will focus on the merits of the constitutional challenges while Mr. Sokol will be focusing on the non-merits preliminary injunction factors. He may also have comments to add on the insurance provision. Thank you. Thank you. Thank you. Thank you. So, the then and what date that is seems to have particular importance in this case, and where we may need to confront that question that was left open in Bruin. Because for many of the particular restrictions that are at issue here, there's far more in terms of analogs when we get into the late 19th century. So can you address that issue writ large? Should we be looking at incorporation? Should we be looking at 1791? And what determines that in the case of a particular regulation? Yes, Your Honor. So, before we get to the question of if there's a conflict between the understanding of the right to bear arms between 1791 when the Second Amendment was ratified and 1868 when the Fourteenth Amendment was ratified, we have to determine whether or not there even is a conflict to begin with. And I would submit to Your Honors that there is not in this case. That is because there is no evidence from the founding or the antebellum era that courts, commentators, other legislators believed that the sensitive places provisions that were enacted would have been unconstitutional. Is silence in one period and regulation in another a conflict? I do not believe so, Your Honor. And that's true for three reasons. The first is Bruin's own evidence about sensitive places, examples of sensitive places that it identified and the evidence it looked at shows the opposite of what it believed. So, Bruin must have believed there was no conflict because it looked at historical examples of firearms restrictions at courthouses where the only evidence came from the 1870s and not earlier. And so, if Bruin did not believe that to be a conflict, the same is true here. In fact, those very laws that influenced Bruin and led it to say restrictions at courthouses are settled as unconstitutional. You say that the silence is because it was so well established, meaning it was part of a preexisting right that's referenced. So, what is that part of the preexisting right that it's referencing? So, it's either that – one can believe it's one of two things. It's either that Bruin believed that the part of the statute of Northampton that referred to you shall not go riding armed into fairs, markets, or before the king's ministers carried over into the common law tradition in the United States such that it infused the era from 1791 to 1868 when there were no statutory enactments about courthouses. If that's true, that would also be true for this case. The language about fairs and markets would be equally influential in your determination of whether or not MetLife Stadium, for example, is a sensitive place as it would be for courthouses. But I don't actually think that's what Bruin was doing. It was looking to the longstandingness of restrictions that were enacted at the very cusp of Reconstruction and throughout that level of – that period of history. So, that's the precedent answer to Judge Cross's question, but there's two other answers, and that's history and logic. So, I want to talk a little bit about the history and the historical record. In this case, what we've demonstrated in the record is that the later development of state legislatures' focus on sensitive place restrictions is explained by policy pressures on those legislatures. Sensitive places laws became more of a focus in Reconstruction because of that change in history and the availability of easily concealable, easily carriable firearms after 1850 when the Colt patent expired and the civilian market became flooded, not because some kind of change in constitutional understanding happened. There is no evidence that there was some change in constitutional understanding. That would go – if there were, that would go to a conflict. But the change in historical facts and what was pressuring legislators to respond to a certain threat, that's in the record here, and that explains why these particular laws were enacted when they were. Is that to say that we have a new problem because there's mass production of firearms in – when we get into the 18th century – I'm sorry, into the 19th century, that we've got different lethality of it, we've got sort of different societal pressures? I mean, if that's so and that creates a new problem, then wouldn't that infuse every Second Amendment regulation that we look at today? MS. BENTONI I think you could think about it as a new problem that happened exactly at the – in the middle of the 19th century that legislatures were trying to respond to. And I think at that time, it believed that the Second Amendment certainly allowed them to respond to those pressures in the way that they did, which is to enact specific regulations at specific locations. MR. GOLDSTEIN What constitutional rule constrained those legislatures around the antebellum era? MS. BENTONI I think it's important to note, Judge Porter, that state legislatures were not bound by the Second Amendment as enacted. We do see evidence from cases even cited in Heller and Bruin that some of them had either state-level analogs or sort of some other – a common-law understanding.  GOLDSTEIN And those that didn't?  BENTONI I'm sorry, Your Honor?  GOLDSTEIN And for those states that didn't have such – maybe Second Amendment analogs?  BENTONI Right. So I think there are states that clearly had Second Amendment analogs that Heller looked at. Heller also looked at states that didn't have codified Second Amendment analogs, but nonetheless believed there was a tradition of protecting the right to bear arms. And that's described in some of those cases. I believe Louisiana and Virginia were some of those cases that Heller looked at to understand what is the individual right to bear arms. So it did look at states that didn't even have, pre-1868, a codified right to bear arms. I wanted to go to the third reason why legislative inaction on sensitive places before 1868 is not evidence of conflict. And that is just federalism and how we think about the logic of what that requires. Legislatures don't operate at the outer limits of their constitutional authority then or today. The choice not to regulate something standing alone is not evidence of constitutional limitation, and plaintiffs have never answered why it is that they believe that legislatures in 1791 or 1815 had to ban something that they did not see as a problem or that their decision not to, because for policy reasons they did not think that was wise, yield some kind of constitutional limitation. Well, that's fair enough, but hasn't the Supreme Court told us that we need to look to a singular tradition? And if so, how does federalism and the variegation among different state legislatures, perhaps even dealing with different circumstances, different policy pressures, but how are we to evaluate that when we've got federalism on the one side and the mandate to identify a singular tradition on the other? I think this record shows that there is a singular tradition, and all of the evidence falls in favor of that tradition. That began with sparser regulations in the 18th century, but continued onwards throughout the 19th century, including at the very moment when states became bound by the Second Amendment. Those statutes were then upheld by state high courts, which universally upheld them on Second Amendment grounds, and that is the tradition that carries forward to today. So I think it would be – the upshot of plaintiff's argument, I think, would be that – take parks as an example. I'll spot you that there perhaps were parks where people gathered for recreation, probably not often common, but perhaps there were other smaller parks where families gathered in the 18th century. It's possible. The fact that legislatures did not regulate firearms in exactly the same way as they later did at those parks doesn't mean that they believed that they couldn't do so constitutionally. The fact that starting with the opening of Central Park, the prototypical recreational park in 1859, I believe by 1861 Central Park then enacted a set of rules that lasted, I believe, until today, though I could be wrong about that, but certainly for a long time. Every park that followed, including here in Philadelphia, Fairmont Park, in Pittsburgh, and everywhere else, including the national parks, all then enacted the same restriction on carrying firearms. I think for plaintiffs to be right, you would have to think that that is not a historical tradition that Bruin would have recognized. And I think that is impossible to square with what Bruin told us about the need to identify historical precursors and to assess whether or not our forefathers would have thought those precursors were permissible under the Second Amendment. In others, there are fewer examples, or the examples that you and Aniki have pointed us towards come from the territories, and some from larger states, some from smaller states. Talk to us about how we should weigh particular evidence. Is it numerical? Is it a matter of, like, three isn't enough, and it's got to be more than that? Are we looking at the percentage of the population at the time? Does that have any relevance? And should we be considering any weight given to territories, given the description that the Supreme Court gave them in Bruin? I'll start with the last person and sort of extrapolate out from that. So as to territories, it is true that Bruin rejected territorial laws in that case. But for two reasons that are not applicable here. The first is that Bruin explained the territory restrictions, quote, cannot overcome the overwhelming evidence of an otherwise enduring American tradition permitting public carry. And Bruin identified, I believe, eight or nine state Supreme Court cases that expressly said states could not prohibit public carry altogether. And so when you have that evidence, which is not here in this case, and you have a couple of territories flouting that, yes, I would agree in that circumstance, those territorial laws do not advance a longstanding historical tradition. The other thing that Bruin said was that the territorial laws were untested in court. That is also not true here. They were not tested necessarily in territorial court, and I'm not quite sure about that, but they were identical to or almost identical to state statutes that were tested in court. And those decisions, such as Shelby in Missouri, Hill in Georgia, Andrews in Tennessee, which the Supreme Court cited in Bruin, those decisions were unequivocal that these types of statutes that prohibited firearms at schools, at literary gatherings, at circuses and exhibitions, and at public assemblies were undoubtedly constitutional. So that's the type of evidence and extrapolating out from what Your Honor was talking about that we have in this case. I don't know what the irreducible minimum standard would be for how many laws would be enough and what kind of case law would you have to have about it. What I do know is if there are several examples of states enacting these laws, they were debated, they were passed on by state high courts, discussed specifically, and were upheld. We have also evidence that commentators at the time, legal commentators in treatises that were cited in Heller, lay commentators, or actually I don't know who exactly they were, but people writing in newspapers at the time, talking about these laws and undoubtedly calling them valid. I think that is the tradition that we have here, and that is undoubtedly enough under Bruin's test. MS. GOTTLIEB I'm sure we all want to turn to some of the particulars of the restrictions, but I want to ask you, if we were to accept all of the arguments that you and your colleague have made, what would be left of a right to public carrying? I mean, if it's true that in all of these venues that have been laid out in statute that the state can constitutionally preclude carrying, and we have a default where folks can't, those who have passed the permit, done the background check, who have qualified as law-abiding and responsible, nonetheless can't take their firearms into any private property, even property that's otherwise open to the public, what is there other than leaving your home and walking down the street? Where could you go and still exercise your Second Amendment rights? MS. GOTTLIEB I think you're right to identify there's two different kinds of laws with respect to locations, and I see my time has expired, but I guess I can answer your question. The first is what are prohibited under the sensitive place provision? That is a very specific enumerated list. Some of them are challenged here. Some of them are not. Separately, there is a private property provision that allows the owner of the private property to decide for themselves whether or not they will allow you to carry. So where someone may carry after those statutes are enforced just depends a lot on what property owners want to allow. Can't the property before 2020, before this Chapter 131, couldn't property owners also decide for themselves? MS. GOTTLIEB Yes, I absolutely agree with that. And I think the important thing to note about what Section 7A24 does is that it changes nothing about the Second Amendment right, which is always, and I think my friends on the other side agree, is always dependent, when you're on private property, on the property owner's absolute right to exclude firearms. So that is true, and I think this is also acknowledged on the other side, regardless of how that owner chooses to use their property.  GOTTLIEB If the Second Amendment assumes you can carry wherever you are, then this flips that presumption and says, no, you can't, unless you get permission.  GOTTLIEB I don't think that plaintiffs even agree that the Second Amendment gives you a right to carry wherever you are. You certainly have a right to carry, but when you're on someone else's property, your right to carry is contingent on that owner's decision. MR.  The question is, what's the default presumption, that rule? Under the Second Amendment, I think the default rule is you can carry, because it's like the Second Amendment, you can carry.  GOTTLIEB I don't think that the Second Amendment sets a default rule. I think one way to think about it, and I think this is the only way for the plaintiffs to successfully argue that the property rule somehow falls under the Second Amendment's plain text, the only way for them to show that the Second Amendment's plain text implicates this rule is if they can show the plain text includes a constitutional right to construe a private property owner's silence as consent or permission to bring firearms. I don't think that the Second Amendment's plain text says that, and it doesn't confer a right to take advantage of the property owner's silence, and I haven't seen any engagement from the plaintiffs on why that is so. MR. GOTTLIEB Why isn't the Second Amendment's basic scheme this, that you can possess and carry inside the home or outside the home for self-defense, but if you go on someone else's property and they don't want you to carry, they can tell you that, in which case you cannot? I think what I disagree with is the very last thing you said, Judge Porter, which is they can tell you that. I don't think that's in the plain text of the Second Amendment, and I will, you know, I think this part is still...  GOTTLIEB No, no, but I'm saying that what is in the plain text is the presumption that you can carry inside or outside the home.  GOTTLIEB And I think that's still true if the places you're going to are not someone else's property where they have an absolute right to exclude, and I think that's, you know, getting a little bit into the history, but I think this historical part is about what the words mean as opposed to what the legislatures have done, and that's shown in our evidence at Blackstone, right? At the time of the founding, if we're talking about the founding, I do want to get back to Judge Cross's earlier question about 1868 or 1791, but at the time of the founding, under property law at the time, there was an understanding that every entrance unwarranted, i.e. you don't have permission into someone else's land, is a trespass, and so with that understanding may have changed over time, but at least at the time of the Second Amendment ratification in 1791, that was the understanding. You can look to other cases. United States v. Jones talks about Entik v. Carrington, a 1765 English case, where that idea that you don't have any right to be on someone else's property without their express permission, that was the tradition that the founders were working with. That's not disputed. I mean, in all of the situations that we're talking about and are contemplated with this default, someone is not trespassing on property in the sense of coming in uninvited. They're invited. It's a business that's open to the public, or you've allowed someone into your home. The question is, what's the sort of expectation, right? What's implied, a sort of implied license when it comes to consent? And, you know, it's not understood that by inviting someone in, you are going to dictate what clothes they can wear, right? If there's a right to carry, why isn't that simply part of what you accept as the expectation, the default, once you've opened up that private property? Because I don't think that an implied license or even an invitation has to carry with it an invitation or license to carry firearms. We know from common law and from cases like Hardina's that an implied license depends on the customs and expectations of the community. And so I think Justice Scalia put it very colorfully in Hardina's where, yes, you have an implied license to walk up to someone's doorstep and ring the doorbell. But you probably do not have an implied license to bring a metal detector and wave around, you know, their steps or to bring a large bloodhound into their yard. That would, in his words, prompt the owner to call the police. And so the question here is, what does the implied license include in the state of New Jersey? That's a matter of substantive property law. And governments regulate property law all the time. And that is when they set default rules, when they flip default rules about property law, as long as there is a choice for the property owner to revert back to whatever decision they want, that is not an infringement on the Second Amendment right. I'm sorry if I missed it, but let's go back to Judge Krause's initial question. If we agree with you on the private property rule and all the sensitive places, where can somebody carry? Yeah, so I think certainly Judge Krause is right that you can carry on the street. You can carry in any place that is not designated as a sensitive park that is up to whoever owns the park, the county, the municipality, or the state. You can carry on any other public land. As to private property, that is entirely up to the owner. So that could include your neighbor's house, a retail store that welcomes firearms, your own office or workplace that allows you to carry firearms. That was not allowed before Bruin, right? So there is a significant change in what is now permitted, and that is the change that Bruin gave us. But I don't think Bruin or the Second Amendment said anything about the property owner's rights and the government's ability to bring those in line with the expectations and desires of property owners in New Jersey. It's somehow hamstrung by the Second Amendment. And I think one example, if I may, on that before I move on to the history is, you know, governments regulate property by default rules all the time. So intespacy is a great example. Rules of where property goes in a divorce is a great example. These are things that governments set. This is how the money will be distributed unless you have a will or unless you write a prenuptial agreement. Those things can change. You know, a private party can change that. But we wouldn't say that by setting a default for the order of priorities for secure lenders, for example, that the government has somehow infringed on the underlying right to transfer property or to own property. Could New Jersey say if you go into someone else's property, you can't express any opinions unless you first get their permission? So I don't think that that is – so there's two answers to that, Your Honor. I think the first is that it is true that there are cases saying you don't have a private property right or you don't have a right to leaflet on, you know, a private mall if the mall owner doesn't want you to. And so the question is, can the government set a default against that? I think that's exactly what the Supreme Court held in Breyer v. City of Alexandria. That case involved an ordinance that said, default, no commercial solicitation at home, period. So it's your position that any time the government sets a default, it just does not implicate a constitutional right, whether it be the First Amendment or the Second Amendment? Just changing a default cannot implicate a constitutional right? I think it can in certain circumstances. And that's when the default rule or anything that the government enacts – the enactment itself includes an invalid classification. So the government could not say the default is no Democrats on restaurant property, except with – because – but that's a different question, right? The question is, has the government classified unconstitutionally, not whether or not the underlying right is implicated or not? So I do think that when the government changes the default with respect to how you communicate your right to exclude or how you transfer property between a person and their heirs, those are not changes to the underlying constitutional right of property, or in this case, the Second Amendment, but rather a change to just the communication requirements for the person. But if you don't agree with me, this is a case where the history is especially on point. There's unusually strong evidence, both from New Jersey and from other states. And I want to focus on New Jersey because we're here, and it's especially strange to think that New Jersey could not in 2023 enact the very same rule that it had from at least 1771 to 1895, possibly earlier. And I think that that law, including others from other states, provided without qualification that an individual cannot carry a firearm on any land not his own without express written permission from the owner. And I think this is an example of where there's certainly no conflict between the founding and ratification of the 14th Amendment because the laws included both periods of time were longstanding. Is that reading broader than what the statute was enacted for, especially in reading it in context of all of its subsections? So if you're, honors, referring to plaintiff's argument that the statute was enacted for the purpose of preventing poaching, we actually disagree with that. Not exactly that. Isn't your reading just broader in that that specification as to where you could or could not default carry really referenced not places that a license had been extended for the public to enter, but rather on private grounds where people customarily hunted? It didn't implicate public spaces or spaces that had been open to the public because those were not the types of places where poaching was taking place. I think textually I would disagree with that, your honor. And starting with the New Jersey statute, this is the 1771 statute, JA 1001. I understand your textual argument, but aren't you broadening how it actually was interpreted and enforced? Ms. Gray, not to interrupt your train of thought, but we're going to extend argument on both sides, so it will be a total of one hour rather than 30 minutes on both sides. Okay, your honor. And Mr. Sokol has reserved 10 minutes of his time, so I don't know how that breaks down, but you can tell me to stop whenever you'd like. So, Judge Chung, I actually don't agree with that for a couple of reasons. The first, back to the 1771 New Jersey statute, that statute had one section on trespass with guns and a separate statute on poaching. In the section one on trespass with guns, in addition to the core language, it also stated that any justice of the peace of either of the counties, cities, or towns corporate of this colony can enforce the law. So it seems very strange to me to specify that urban justices of the peace can enforce this law if the goal or if the premise of the statute was really about plantations or things of that nature. So I think the text, I think, doesn't form the extent of this particular law. With respect to some of the others, I think the argument is also very attenuated and I think contradicted by the historical understanding of the words used in the statute. So, for example, in the Louisiana 1865 statute and the Oregon 1893 statutes, it says premises or plantations. And we provided contemporaneous cases talking about premises as businesses. And so I think that is that the language of premises or plantations makes it quite clear that the legislature has contemplated the application of this law to businesses as well as private, you know, businesses open to the public as well as private homes. And so I don't think that distinction makes a ton of difference. I know that the plaintiffs also focused on the word improved or enclosed. It's really unclear to me what the upshot of this argument would be because I presume that all shops and businesses today that they would be entering are enclosed. There are certainly improvements on the land from, you know, the commons. And so I don't think that actually makes any difference whatsoever. So could you address another specific one that is the bars and other locations where alcohol is served? Yes, sure. Because most of the historical examples seem to be directed to the intoxicated person, not the place. It is certainly true that legislatures sometimes chose to enact regulations that only focus on people who are already intoxicated. But other legislatures did choose both then and today to restrict firearm carry entirely in places where people are drinking. And so we gave examples of the enactments in New Orleans in 1870, in New Mexico in 1873, and Oklahoma in 1890. And I think that, you know, many other states including Louisiana today, Alaska, Kentucky, Florida, they all have the same prohibition. And I think that's because that is a historical tradition that is well developed. I do agree that some states chose to regulate it in a different way. But I don't think that that is indicative that regulating it in the way that New Jersey and other states have chosen today would have been seen as unconstitutional. I will also note that a lot of the places that were discussed like ballrooms and social parties, I don't know if those places would have necessarily served alcohol on premises. But I do think that the idea that the underlying theme is the same. These are places where people are in a heightened state of frenzy, where that particular location legislatures chose as sensitive because – as opposed to, you know, a bakery or a tailor, some other social place or other place that you may be in as a person in public. They chose these places because of the state of individuals who are going to be there. But they specifically enumerated places. They very easily could have said tavern, saloon, and they didn't. Yes, Your Honor. Some of them did and some of them did not. Some of them don't. You've named the only ones that do. I think those are the only ones that do. But again, Your Honor, we are not historians. We're doing what we can with the history that has been digitized and provided. Before us. That's before us. That's correct, Your Honor. So I'm just not foreclosing that there may have been other ones. That is true. It is true that some legislatures chose not to go in that direction. But I don't think that is proof of unconstitutionality, especially because... But if the problem was intoxicated with people with firearms, and Gruen says if legislatures chose to address it another way. So this isn't silence. Most of the legislatures chose to address it by banning intoxicated people from bearing firearms. That's a materially different way. This isn't silence. This is a different burden. I agree, Your Honor, that it's not silence. But I think it's just a different policy choice. Today, legislatures make different... But isn't it a policy choice that matters under Gruen? I don't think so, Your Honor, because Gruen and other precedent as early as Justice Brandeis to Justice Gorsuch in the Cook producers case made it very clear that state legislatures are laboratories of experimentation and democracy, and they get to choose even novel or unprecedented or choices that other states did not choose. And so it's possible that New Orleans saw a particular problem with people carrying firearms at taverns and decided the only way we can really resolve this in a way that makes our people safe is to have a broader limitation. That might be, but does that establish a historic tradition of regulation? That's right. When you said novel and unprecedented, my ears perked up because that seems... How do you fit that in with history and tradition? Yes, Your Honor. And I think the key is if it was something that so clearly restrained constitutional rights, you would have expected someone to be commenting about it. You would have expected legislators to be debating about it. And you would have expected them to be challenged in court and struck down, which is what happened in the cases cited by Gruen. There were states that enacted total flat bans on public carry. Those cases made it to state courts almost immediately. And those courts then said, that is not permissible. We're going to either have a limiting reading of the statute to allow some other kind of carry, or we're just going to strike down this enactment in the first place. We don't have that here. On bars and restaurants. Oklahoma, 1890. New Mexico, did you say 1873? 1853, Your Honor. 1853. New Orleans, 1879. So that's three states post-Civil War. I believe none of them had a baby second amendment at the time. Why should we consider that to be strong evidence? I think that that is evidence that those legislatures made that choice, and it was not something that the polity or other legislatures saw as unconstitutional. So I think there is definitely some weight to be provided there. It would be one thing entirely, Your Honor, if as soon as New Orleans came out with that restriction, and there's no evidence of that here, people were challenging it. People were commenting about how this tramples on the rights of the Constitution, provided in the Constitution, especially since the Second Amendment now bound Louisiana. I will note that Heller noted that Louisiana also had a pre-Second Amendment or pre-14th Amendment version of their understanding of constitutional rights to allow individual right to carry. So I think that is indicative of this. It sounds like you're adding to the evidence that Bruin discussed. Silence as evidence of a history and tradition. I don't think I'm adding to it, Your Honor. I'm just contrasting it with what Bruin had. And I think the language that Bruin used talks about, you know, single laws in effect in a single state that, quote, contradict the overwhelming weight of other evidence. That's what we're focusing on. That's the language that Bruin used to describe what it saw with respect to total prohibitions on public carry. And that's what we don't have here. There is nothing on the – there's no weight of other evidence on the other side. There is no evidence on the other side. I mean, Bruin seems to consider silence to be a problem for the government, because you need to fill up that silence with, you know, widespread laws. That's the tradition. And you're saying, no, silence works to our benefit because nobody's complaining. I do think, Your Honor, it would be detrimental to us if the problem was a recognized social problem or technological problem, and nobody – not a single state – reacted to it with a restriction on it. Guns in taverns? Sorry, Your Honor? Guns in taverns isn't a widespread problem at all times. And I think we would lose if there were no enactments whatsoever. But there were enactments by state legislatures to prohibit firearms at taverns. So that's the difference that – what we have versus what Bruin said about the lack of that. But should we be thinking – and does it matter whether this is a new problem or an old problem? I think it matters only in terms of the level of analogizing you would need to do. But in terms of old problems, the sort of default going back a couple hundred years seems to be open carry. What do we have as the law in New Jersey? I'm sorry, are you talking about the private property rule, or are we still talking about taverns? Taverns. So in New Jersey, I believe that there were – we're not aware of sensitive place prohibitions at taverns in New Jersey. That's correct. I'm asking a different question. Today, what's the law in New Jersey about open carry in a bar? It is not allowed. So is part of the issue here that we're dealing with the contrast of a situation where it was open carry, someone becoming intoxicated and bearing arms with a visible phenomenon, and action could be taken, versus what we have today with the proliferation of firearms, with concealed carry, and the inability to recognize that. Is this an old problem, or are we confronting a new problem that allows for more nuance in the way a legislature approaches the issue? So there's two answers to that question, Your Honor. The first is, as a historical matter, all of the statutes that we have cited in favor of both the tavern provision and libraries and schools, those were total prohibitions on carry at sensitive places. Concealed and open. So those are legislatures understanding that open carry was otherwise permissible on the streets and other places. Nonetheless, deputizing these specific locations as so sensitive that no carry is permissible. How long has it been prohibited to carry in a New Jersey bar? So assuming the bar owner has not said anything, it's been prohibited since December 2022. And, but of course, the tradition... So before this law, you could in New Jersey? Yes, Your Honor. I will note before Bruin, you would need, justifiable need to carry anywhere publicly in New Jersey. And so there's the number of people that are, they are different, yeah. So, but to your question about the social problem, I think that social problems do change, and the magnitude of them do change over time. And the specific concerns about them may change over time. I do think that for problems that existed in the same form, even if the magnitude is different, we do need to show an analog that is distinctly similar, relevantly similar, however you want to, depends on how different it is. And then there are places that perhaps existed by name, but the concerns at them did not exist in the way they do today. Beaches is a great example. Certainly, I don't contest that there were shorelines in 1791, but I would hesitate to say that anyone would have thought the concerns of carrying firearms at the Jersey Shore today existed in 1791. So, I think we have to really look at what are the social concerns of the place that we're talking about, imbued with all the other issues that may not have been present at the founding, including what kind of firearms, how many people would have them, are they concealed or not, that sort of thing. Can we talk about permitting requirements? Yes, Your Honor. The four person, four reputable person rule, to me, sounds an awful lot like, you know, sort of a version of the New York rule that Gerland struck down. You know, you have to come in and either by your own story in New York or with four reputable people in New Jersey, you have to persuade someone from the government that is exercising discretion and judgment and so on, that you're okay. Why doesn't this fall almost squarely within Bruin? Because there's a very specific standard that the licensing official is measuring against, and it's not justifiable need, it's not you're okay. It's whether or not you're likely to engage in conduct other than lawful self-defense that would pose a danger to yourself or others. And I think that is something that Bruin has endorsed as something that is permissible as a licensing scheme. And that's all the reference is supposed to be. Why don't the background checks do that? I'm sorry, Your Honor? Why don't background checks accomplish that? I think this is a form of the background check. So if Your Honor's talking about a criminal history check, I don't think that accomplishes this goal because there are people who have not been convicted. The background checks are objective, right? This kind of seems pretty subjective. You bring in some friends and neighbors and stuff. I don't think it's subjective, Your Honor. The reference just has to sign a, I think it's a quarter of a page form, one page for all four people. And it just says, you know, the person who's applying their name is unlikely to engage in conduct other than lawful self-defense that would pose a danger to themselves or  And I don't know them to be abusing drugs or alcohol. Is any part of it discretionary? Who decides who's reputable? What is the definition or what is the guidance on reputable? I don't know if there's been a challenge on who is reputable or not. I don't know if that's been like a problem necessarily. It's references that the person, the applicant identifies. I suppose, Your Honor, if your reference is Tony Soprano, that would probably be a problem. And I think the law limits it to people who are not related to you. So your grandmother could not vouch for you. But it's just another citizen who knows you, who has information about your propensity to harm yourself or others. And I think that's the objective kind of standard that Bruin endorsed. Do you think there's any other constitutional right where we need that kind of requirement before we can exercise it? Your Honor, I can't think of another constitutional right where the possession of the item could immediately cause harm to self or others. There are certainly rights that impinge on public safety, right? I agree with that. So the Fourth Amendment, of course, the exclusionary rule could have impact on public safety. But I think Bruin recognized the Second Amendment is unique. You do endorse things such as background checks, safety training, that sort of thing. And so this is really no different. And I'll give you an example. So I think – I don't think plaintiff's challenge, and I don't think it's contested, especially under Heller, McDonald, and Bruin, that individuals with a history of mental illness or alcohol abuse are not permitted to carry firearms. Those are things that you can't just look up in a database. Historically, I imagine that the sheriff of the town may already know who has those problems. Today in New York City, Jersey City, Trenton, that's very difficult for the police department to do. What they could do is go into a – theoretically could do is go into a broad-sweeping inquiry into everybody who's ever known you of the sort that you may do when you're trying to get a security clearance. This is not it. This is you, the applicant, just list four people. And remember, the plaintiffs themselves do not say that they can't meet this requirement or that it would be difficult to meet that requirement. In fact, they have met this requirement when they got their permits. And so I don't even understand what the injury is to them, much less a constitutionally protected interest in not listing references. It's a facial challenge, right? It is a facial challenge, Your Honor. But I think because they haven't shown that they would be denied the right to carry, what they're challenging is, like, their right to not write down someone's name, which I – it's hard for me to imagine how under TransUnion or even Spokane that is a concrete enough an injury to even be here to talk about this. But even if there were, I think it is supported by historical tradition because historically this has been something – background checks and references have been something that legislatures used to determine whether or not someone poses a threat to safety of themselves or others. MS. RAYMOND In the same vein as the permitting scheme, as a hypothetical, could you send a $50 bill annually to every permitted – everyone who is a permit holder for – to deposit into the account? Would that be constitutional? MS. RAYMOND Sorry, Your Honor. Who is the – you – who's sending the –  RAYMOND Could New Jersey send an annual bill to every permit holder for $50 to deposit into the account, the crime victim's account?  RAYMOND So I think it's two steps, Your Honor. So could the state charge a permit holder $50 to have the permit, to continue having the permit, or to –  MS. RAYMOND They now have the permit. Every year can you just send them a bill for $50 to deposit into the crime victim's account?  RAYMOND I think so, Your Honor, and that's true for two and perhaps three different reasons. The first is historically we cited a number of statutes going back to, I believe, Mississippi in 1847 or 1867, I forget, where they charged people a fee, a flat fee every year for having a firearm. Where that's deposited actually went into the general revenue fund of the state, and some were designated for bridges and other forms of, you know, police fund, government, school pensions, things like that. That's the historical analysis that Bruin asked us to undertake with respect to the legitimacy of validity of a current law, and that is supported by historical tradition. The second thing to note is that plaintiffs are not challenging the size of the fee. I think their argument would be exactly the same that there was $5 or $1. They're saying because the state, the legislature in December 2022 has decided this amount we're collecting from you is going into this fund, that is somehow per se unconstitutional. That's just not how the law works as a matter of appropriations law in New Jersey. We did raise that argument below in the PI hearing, and that's never been responded to. That's just not – you know, the state collects money, money is fungible, and it – wherever it decides to designate that money is not something that either binds future legislatures or is indicative of what the money was originally for. But New Jersey say it doesn't matter where we're sending it. You just have to pay this fee to exercise your right. You've got to pay it. So as a matter of history, I think yes. To be clear, though, that's not what we're representing the $50 portion to be. I'm just saying even if it were that, that would be permissible under the history test of Bruin. Now, I do want to specify, though, that if Your Honors thought that the – you know, Bruin didn't abrogate the test in Cox and Murdoch, their reading of Cox and Murdoch is just incorrect. Nowhere in those cases do the courts say you can only use the money spent to process this application, to, you know, look up and, you know, how many people are going to be here, can you do your parade, and to process that application. Rather, Cox and Murdoch both said that the fee amount would be evaluated against the strength of state interests in order to police that activity. And so it's not just how much money does it take for your application to be processed, but rather how much – is it related to the state's interest in policing the activity of carrying firearms in public? Is that what's being policed, or is it the permitting, the asking for a permit? Is that the activity that's being policed? So under Cox and Murdoch, it's certainly not getting the permit. And we know that because in Cox, it was up to a $300 fee for a one-day silent demonstration of Jehovah's Witnesses. I don't think anyone was suggesting it cost $300 to process that one application. Rather, the court said you would look at how many observers are going to be there, how big are the crowds, how many – Right, so those are one-off events that have associated costs that can be estimated for that – again, based on what that one-off event is. These are people who have presumably means to – meaning they don't have prohibiting backgrounds – to legitimately possess firearms over a continuing course of conduct. That's very different than a discrete event that has estimable costs that can be determined. It's – that activity is a discrete event, whereas this is an ongoing course of conduct for however many times they renew the permit. And to attribute costs for someone who's lawful and has never used a firearm or shot someone or caused mayhem or disorder, I think that's the issue. Like, how can you assess that cost to someone when it's not like a parade where it's known this much trash will be generated, this many security officers will need to be assigned to this? Your Honor, I think that Cox and Murdoch, if we apply their reasoning, which we submit is not applicable after Brewing, you would look to what they said is permitted for the size of the fee. And it is the amount imposed as a, quote, regulatory measure to defray the expenses of policing the activities in question. I agree that the activities in question are different. However, the protesters or the Jehovah's Witnesses and Murdoch and Cox had not demonstrated that they would violate the law, cause a riot, generate trash, any of that, right? They could have said we're going to clean up after ourselves entirely. That's not the question. The question is the state is – has – will incur expenses in both processing the application, maintaining the platform for the application, and doing the background checks, as well as policing the activity in question, which is if people show up more and more in public with their firearms, the level of policing required is going to increase. That is a cost associated with regulating the policing, the activities in question, in this case, public area firearms. Let me ask a different way at the question I asked a few minutes ago. I just want to make sure I get your answer right. Could New Jersey say – I know it's not this case. Could New Jersey say you want a permit, you have to pay $200. It's not for cost reduction or anything. It's because that's the amount we want to charge you to exercise your right. It's $200 if you want a permit. As a matter of history, I think the answer is yes. I don't think that's actually what's happening here. Remember, this is a dollar amount that had not been changed since 1970. So all it does is reflect the amount of inflation. It actually is less than the amount of inflation. So I don't think that's what's happening here. But I think the historical answer is yes. We've covered almost everything. I do want to answer a question that I just asked you at the very beginning, which is if there is a conflict between 1791 and 1868, which governs? And I answered by saying – by resisting your hypothetical saying there is no conflict. But I do want to make sure that – I spoke a little bit about if there is a conflict, why it's so important that the right, as it was understood when it was ratified by the states, is what controls and the understanding of that right. The plaintiff's theory would not make any sense. You would have to believe that the states ratified a version of the 14th Amendment that they did not understand to exist and became bound by that. That goes against every principle of originalism and of democratic legitimacy. And I think what Heller said was constitutional rights are enshrined with the scope they were understood to have when the people adopted them. The only method that fulfills that goal is to look to what the people, i.e. the states, understood when they adopted the 14th Amendment. So I just wanted to make that clear before moving on to – I guess all we have left is insurance. I don't know if your Honor has had questions about it. If not, I'll just say one very quick. MS. HILLERY Well, I think we've – we're at time. MS. HILLERY That's all right, Your Honor.  HILLERY So much more we could cover. I'd like to ask you one quick question before we sit down. Maybe it won't end up so quick. But what significance is there to the nature of the people involved? Some of the arguments seem to be that these are spots where there are vulnerable people, like children or elderly people or infirm people. Where is there some historic analog for that? How are we supposed to think about the how and why of that? MS. HILLERY I think it's important for us to make reasoned judgments about where are their specific locations where the existence of firearms is so incompatible with that location that we're going to ban firearms altogether. And I think what we can glean from that is how they made those choices. So the fact that they chose schools as opposed to offices or factories shows that if there's something about schools that's different from those locations. I think it's one of two things, and I think it could be both. First is that it's a place where the purpose is for the congregation and concentration of young, vulnerable individuals such that they would feel threatened if there were arms present. Or it could be still with the designated purpose of the place, which is the gathering of children, where there is more damage in terms of panic or in terms of accidents or in terms of disaster, even if someone were to only use their firearm in self-defense. So it could be both of those ideas, but the fact that they drew those lines – schools as opposed to offices, courthouses as opposed to law firms, or racetracks and ballrooms instead of bakeries and farms – right, those are decisions that historically legislatures made, and we look to what is distinguishable about those categorizations and whether or not those categorizations make sense and are analogous to the categorizations we're making today. Many of our provisions are identical to the same categorizations that legislatures made in the 19th century because the same concerns still exist. Some of them are slightly different. You know, they didn't – I don't know if large sporting venues existed, but they certainly do exist now. The same concerns that what you would have at a racetrack or a ballroom would exist today. Does this extend to commerce, to the exchange of goods, to – how do you account for things like fares? Your Honor, I don't know exactly whether it's the existence of commerce that led Virginia in 1789 to designate fares and markets as sensitive. I would suspect that it's not just commerce, because if it were commerce, it would be more than just fares and markets. And so they're limiting it to fares and markets. Historically, we understand that many people congregated there with their families to gather goods for the week, and that kind of crowded space, perhaps much like, you know, the parades of today was – you know, what was happening then, that's the kind of thing that they were concerned about in the people present there. If the rationale is vulnerability, isn't – and if you can't carry in sensitive places, isn't everyone vulnerable in that sense? Isn't an adult male as vulnerable since he's not – since he can't carry as a child in that sensitive place against someone who is in violation of the law shooting guns? I think that's a judgment that historically legislatures have made, that you can make the same argument about polling places, right? People – I don't think that's a vulnerability standard, but it is a site of democratic activity. You can make the same argument about any sensitive place that the Supreme Court has endorsed as settled constitutional. And I think there are policy arguments one can make. Perhaps some legislatures agreed with those policy arguments. Other legislatures did not. And we see a specific history of legislatures that have designated in their judgment, these are the things that we need to focus on to keep our citizens safe. And courts over and over again endorsed that ability for the legislatures to make that decision, and that carries through as a historical tradition to today. Thank you. MS. DELLINGER And thank you.  On behalf of the presiding officers, we join in the arguments that have been offered by the Solicitor General for the State and the Attorney General, and we will address two issues. One, the matter that is currently before the Court, which is whether or not to issue a preliminary injunction, and the other is the insurance requirement that is in Chapter 131. Our position on the first issue is that the plaintiffs have not met their burden, following the factors that are set forth by the Supreme Court in Bendisec or by this circuit in Riley, and because they have failed, the application should be rejected and no injunction should be issued against Chapter 131. The Bruin held that the Second Amendment should be considered on a par with all of the other freedoms set forth in the Bill of Rights, but it also said that like all the other freedoms set forth in the Bill of Rights, it is subject to the laws that are not implicated in the Second Amendment, and one of those is the other factors that have to be considered by the Court when an application is made for a preliminary injunction, and both Bendisec and Riley tell us that first, a preliminary injunction should be issued only in rare cases, that it should be done by balancing the equities, that you look at the four factors. The plaintiffs have said that because we hold Chapter 131 to be unconstitutional, we only need to satisfy the first two, likelihood to succeed on the merits and irreparable harm, and they both flow from the same issue. They say that because it's an unconstitutional statute, we're going to succeed, and because it's unconstitutional, you can't force people who have permits to own and carry guns to be subject to the restrictions of an unconstitutional statute. Can we skip past the preliminary injunction standards and just go straight to the merits, because there's an applicable, clear, legal rule, and the facts really aren't, except for maybe, you know, transportation hubs. I don't think the facts are really disputed, so could we just go straight to the merits, in which case the burden's back to New Jersey under Bruin. I'm not sure I understand the question. Could you repeat what you said? Rather than deciding if we're going to uphold or tinker with the preliminary injunction, could we sort of just go past, just look past the preliminary injunction and go straight to the merits under Bruin, go straight to the Second Amendment question and decide it ourselves? I suppose that you have that power to do, but I believe that the matter before the court, the matter that's been briefed, and the matter that we all came to argue about this morning was the application for preliminary injunction. I'd like to ask you about the insurance requirement. When we are looking at things like the requirements that go along with obtaining a permit and the insurance requirement among them, do we need historic analogs for that? Yes. And I think that what we have done is demonstrate that the historical analogs of the antebellum area, which are more applicable, and the ones that were cited by the court in Bruin are the ones that are most applicable. And those are the ones that deal with the requirement that when someone in a community is identified as potentially inflicting harm with a weapon, which in those days was a Flintstock pistol, that there was a mechanism by which the community or the leaders of the community could impose a surety requirement to be posted. But that example in history, in all but one case, involved either a showing already of a fray during terror to the people, or a complaint that was made as to the particular person. Here, this is a blanket requirement that's being imposed on everyone. What's the historic analog for that? We follow the analysis done by the court, where they surveyed the fact that the requirement of a surety bond did not interfere with the right to carry. So, they effectively separated it from the right that you have under the Second Amendment to own and carry. They then went on, and if you take the exact quote from Justice Thomas, it is basically – it's a mechanism by which you assign financial responsibility for the harm that could be imposed by the carrying of a weapon. And when you now use that analog and apply it to current situation, where instead of an individual who might be dangerous, you have hundreds of – the prospect of hundreds of thousands of people in New Jersey who will now legally own and carry guns in public. And all of the scholarly studies and peer-reviewed studies that collectively conclude that the more guns in public, the more likely there will be injuries or death created by accidents, either accidental or through negligence. The legislature is confronted with that prospect, and the legislature decided correctly that the way to assign financial responsibility in that case is to require insurance because you then spread the risk over the full pool of permit holders, and you also ensure that someone who has been injured can have their liability redressed monetarily. And just as important – in fact, I think it's even more important – it protects the gun owner, because if the gun owner is in a situation where an accident occurs and somebody is injured and they get sued and they're not insured, it could be devastating. It could wipe them out financially. QUESTION What kind of – what kind of policy would satisfy the insurance requirement? SECRETARY KERRY And it seems that New Jersey looked askance at the self-defense policies, and no one is offering those. So what is envisioned, or are those now back in play? MR. POWELL Well, no, you have – and the evidence before the court is that many, if not the majority, of permit holders would already be covered by their homeowner's insurance or renter's insurance, and those policies covered general property and casualty coverage. QUESTION I thought the Commissioner of Banking and Insurance wasn't even sure whether there would be coverage under renter's or homeowner's policies. MR. POWELL I'm sorry, I didn't – I'm just seeing the question. QUESTION Well, you're indicating that it's clear in the record that this – these sorts of – this coverage is available. And it's – I'm wondering where we find that, because it – would we consider the – on the one hand, this requirement that's imposed as a sort of sign of fine art for being able to exercise your Second Amendment right? And then on one hand, and on the other hand, the governor's executive order that has had the effect of many insurers being unwilling to provide the sorts of coverage that it seems like would be needed. Isn't that a catch-22 for a law-abiding citizen who wants to exercise their Second Amendment right? MR. POWELL No, I think that there's nothing before the court and nothing that I'm aware of that says that the insurance industry collectively is unwilling to provide insurance for this purpose. And we have expert opinions that says that the policies that you currently have in place will cover liability that occurs from an accidental discharge of a weapon that you own that causes injury to either property or person. QUESTION What do we do with Erdogan's observation that these charity laws were triggered only after an individual was reasonably accused of intending to injure another or breach the peace? And without that sort of proof or accusation, the charity laws just didn't matter, they didn't apply. MR. POWELL Well, the charity laws apply to the circumstances that existed in the antebellum area where you had small communities, everybody knew everybody else. QUESTION But they weren't generally applicable, were they? They only applied to somebody who went around terrorizing the community. MR. POWELL Well, they thought they were viewed as a threat and it was a way to assign financial responsibility. It's not an exact twin, as Bruin says. These are not exact twins, they're analogies that you then import and apply to current modern situations. QUESTION So I guess the question is whether it's a close analogy if you're applying it to everyone versus somebody who's shown himself to be a troublemaker. MR. POWELL Yes, and I think that the best argument I can give you is the argument that Justice Thomas provided in his survey of the charity laws of the antebellum area and concluding that they do not impose a burden on the right to carry and that they are examples of assigning financial responsibility and we've taken that lesson and applied it to the current situation in Chapter 131. MODERATOR Okay. Thank you. MR. POWELL Thank you. Getting back to – am I finished? MODERATOR I think we're out of time. Thank you for your remarks. Ms. Murphy and Mr. Patterson, we'll give you 80 minutes to divide and you can take that. MS. MURPHY Very good. Thank you. Thank you, Your Honors, and may it please the Court, Erin Murphy on behalf of the Siegel plaintiffs. Bruin made clear that states may not impose ahistorical conditions on those seeking a permit to carry a handgun for self-defense. And while Bruin acknowledged that the Second Amendment allows states to prohibit firearms in certain sensitive places, it explicitly emphasized that the historical record revealed relatively few of these exceptional places and expressly cautioned against defining the category of sensitive places so broadly as to eviscerate the general right to publicly carry arms for self-defense. MS. MURPHY Do you agree, though, that – Bruin also says that we can draw on those historic analogies to apply to new and analogous places. MS. MURPHY Certainly, but we're not here talking about a bunch of new places. I mean, New Jersey, you know, if you take a look at the way Chapter 131 is designed, it essentially identifies everywhere people would go except for sidewalks. I mean, even streets. If you're in a car under this law, you can't have your firearm. And as I understood counsel to say when asked the question today, it doesn't allow you to carry anywhere essentially except for private property with the express explicit permission of the private property owner. I don't see how you could possibly reconcile a law that takes that approach with what Bruin said, which is this is supposed to be the exception, not the norm. The norm is you get to carry in places where people frequently go. And the state needs to demonstrate that there's something different about a particular place that makes it exceptional and not like the ordinary places that people typically go. Yet here we have a law that basically just catalogs all the ordinary places that people go. And you have arguments in the state about, you know, they're crowded, there's lots of people here. I mean, those are the explicit arguments that were rejected in Bruin because that is what New York argued, that its law could be justified as a sensitive places law because all of New York is very crowded and there's police there to protect people if there's a problem. So I don't think you can do it at this high level of just like, you know, there were laws historically that defined, that had sensitive places. So we have sort of carte blanche to declare them all sensitive now. I think you really need to do the hard work that Bruin contemplates of saying, okay, what is their historical, you know, what places were there? What is common about those places that differentiated them from other places? And how do we take those principles and apply them, carry them forward? And I will note that, you know, Bruin made a point of, I mean, it actually italicized the word new when it talked about new and different places that might be sensitive. So part of it has to be a question of, are we actually talking about new places or are we just talking about new restrictions on places that have been around for a very long time? And what is, even taking the examples that we've gotten from Bruin, what is that common principle that you were referring to? What unites and is a common how and why for schools to courts, polling places? Sure. So to start with the three that Bruin specifically articulated, the courthouses, polling places, and legislative assemblies, I think that the kind of obvious commonality of those three places that doesn't exist vis-a-vis a lot of other places people go is that the government treats them as sensitive in lots of respects, not just as you can't carry firearms there. They have their own kind of dedicated security that's there. And while they're open to the public, there are restrictions. You may be screened. They ensure that people are not coming in with firearms. They don't just say, we have a law and we hope people follow it, but we're doing nothing to make sure that the criminals don't show up with firearms. Now, I will grant you- You may be, but I mean, there are plenty of county courthouses where you walk in and there's no security at all. And polling places where you walk in, there's no security. And I don't think it has to kind of become like a factual question about, is this particular place providing sufficient security? But if you're looking for a commonality, I mean, if you take a look at the Kuntz brief on pages 24 and 25, they detail a ton of historical laws that specifically required security to be there at polling places and courthouses and legislative assemblies. And there were some laws at the time that imposed those restrictions, restricted those places. And you can trace that particular, but particularly, especially the courthouses and legislative assemblies, you can trace that all the way back to the Northampton statute, because setting aside the part the court dealt with in Bruin that was about interpreting how the kind of fairs and markets and other places, peace work, there was a separate provision that prohibited going, you know, armed with force before the king, the king's ministers, all of the people working in the government while they're doing that work. And so this is a tradition that, you know, there's never any calling of that into question. Sir John Knight's case, all the stuff Bruin talked about for purposes of interpreting the ability to carry in other places. Nobody ever questioned the laws about not carrying before the king's ministers. And that's the tradition that existed as a common law matter and that we see carried forward. And I'll admit, there's not a ton of laws from the founding era that actually said that as a statutory matter. But the common law was, you know, existed, whether or not it was codified in states, and that was a common law tradition at the time. And so I think you can look at those places and say, you know, that's something that makes them different. Now, does that mean, you know, anywhere the government provides security, it can declare sensitive? I don't think that's quite the right way to think about it. I think another feature you would identify as to those three places is that they are places where you have really core functions of government going on. They're inherently governmental places with the key aspects of democracy coming before the court, deliberating on the legislative floor, casting your vote, you know, so that's another feature there. But couldn't you look at those also as places where one's exercising their First Amendment rights, or where there's, you know, a conflict with other constitutional rights and values? I think that leads you right back to the Bruin problem, because people exercise their First Amendment rights in public. I mean, people are constantly talking, expressing opinions. People gather places to talk with other people and debate. That happens at, you know, it happens at restaurants, it happens at bars, it happens in parks, it happens on streets and sidewalks. And so if you take that as the principle, I think it leads you right back where taking, you know, crowded as principle does, which is nobody ends up getting to carry anywhere. And any principle that takes you there can't be consistent with the way the Supreme Court was interpreting this. Like, you got to look for something that would explain why you had laws that had to do with these places while you didn't have laws that had to do with, you know, the taverns or the markets or, you know, the churches. I mean, the churches, people at the time of the founding, the only laws about churches were laws that required people to bring their firearms to churches, which is awfully difficult to reconcile with the notion that, you know, that they are historically a sensitive place. Well, that takes us back to which time frame we should be looking at, because there are statutes, plenty of statutes that go the other way with many of these things once we get into the 19th century. So which is it and why? Yeah, and you know, I will start by answering the same way the state did, which is I actually don't think it matters in this case, because it's not just, you know, a matter of timing here. New Jersey, even if you take the universe of laws they've identified for most of these for most of these provisions, which are like four laws passed by four states between 1869 and 1879, plus a handful of territorial laws and a couple of municipal ones, those are almost the exact same law. I mean, there's a huge overlap between those laws and the laws that Bruin itself considered and rejected as inconsistent with the traditions of this country. I mean, take for instance, you know, one of those four laws. We're considering a different issue in Bruin. They're considering whether or not there was a public right to carry. Here, you know, we really have to consider each subsection of the statute and whether there's a historical tradition vis-a-vis that particular subsection. Sure, but I think the problem with that is when you go look at the decisions that upheld the provisions both as to general carry and as to particular locations, the reasons those courts upheld them was because they didn't think there was a right to carry in the first place. And if the reason they're saying, of course you can prohibit it in all these places is because they don't think you have a right to carry in the first place, then to the extent those even are sensitive places laws, they fall under the same reasoning for why they fell in Bruin. Because if your tradition that you're starting, you know, that you're analyzing them against is people don't generally get to carry, then of course you're going to end up saying it's not a problem. And I will note the way that these laws tended to work, they weren't, it wasn't like this where you have something that's saying like generally you can carry but not in these places. These were jurisdictions where at the time you generally couldn't carry and they were imposing a heightened penalty if you carried in particular places. Because especially in the territories, you generally couldn't carry at all and there was just a heightened penalty if you carried in particular places. So if you're already talking about a jurisdiction that is an vis-a-vis our historical tradition and they're saying you can't carry at all, I think that's really the wrong place to look for a historical tradition. You need to come forward with some states that are actually, you know, that are applying the traditions of this country and saying yes, usually you can carry in most places but like here's the reason this place is particularly problematic. We disregard cases where I mean the opinion in the court is it does gesture to being a right associated with the militia but in addition to that talks about it as a right to self-defense. No, I mean I don't think you have to discard every case that talks about anything being militia related but what is a problem is when you have a decision like something like the Hill case from the Supreme Court of Georgia that upheld the carry restrictions and locational restrictions. And what they said is look like yeah there's some sort of right to self-defense but like ultimately this is really about a militia right and so they said you can prohibit carrying in places where you don't need to be able to carry there to learn how to carry a firearm well for purposes of being as they called it, you know, a shooting soldier. And so if they're conflating those two things so directly in that way and saying that essentially the right to self-defense is like limited to the circumstances in which it actually advances the militia interest then I don't think those cases work because they're not recognizing the right in the right way. And that's really kind of goes back to Heller even. That's sort of what the Supreme Court said when they were distinguishing a couple of cases. I think the Anders case or one of the cases from Tennessee that sort of took that approach of yeah you have a right but it's ultimately only, you know, the boundaries of your self-defense right are determined by militia interest and so I think those cases go astray. If the through line for the Legislative Assembly's courthouses polling places is these are places where the government provides heightened security. How does that apply to schools which until recently that hasn't been the case? So I think that the school's justification is probably a little bit different. Schools, there's kind of in local parentis concept of the schools, they are places that have custody over the children. You know, you're essentially surrendering the children to the care of the and today school is compulsory, you know, so you're kind of doing that also at the behest of the state. And so I think you could take that and take that principle and maybe that does help the state in some of the provisions, you know, of the many provisions we haven't challenged here. Some of them deal with facilities where you have a custodial relationship vis-a-vis vulnerable persons or people who don't have Second Amendment rights. And so if you think about that kind of in local parentis concept, the custodial concept, that may apply, you know, to the types of places that generally aren't open to the public. I mean, yes, the public, you know, schools have varying degrees of security, but nobody really thinks the public can just like come and hang out and mill about in the classroom while school is going on. It's not open to the public in the way the types of places that we've challenged here are, which is people are, you know, welcome to come and be there pretty much whenever they want, as long as the facility is open. Playgrounds and youth sports, I guess, are justified because they're sort of analogous to schools. Why does that work or not work? Yeah, so I want to be clear about the scope of the challenge as to those. So if you're talking about a playground or a youth sporting event at a school or child care facility, they're already covered by the provisions we haven't challenged. So the provisions we've challenged and the, you know, what we've said to establish here only have to do with when you have a playground that's just kind of like in your neighborhood park or whatever it may be, or a youth sporting event that's not connected with a school or anything like that. And I think in that context, you don't, you don't, I mean, parents don't like surrender their children to the custody of somebody at the local playground. And so that argument in your reply, have you forfeited this issue? You really only addressed youth sporting events in a footnote in your opening brief. I don't, I mean, the argument is the same as to the arguments that we're making for purposes of defending the provisions we did win on like zoos. And so, you know, there just, it doesn't, there wasn't a lot more that needed to be said other than this applies equally to these provisions. It's not a different argument because it's the same reason why I think the district court was absolutely correct to say, zoos are not like schools. You don't surrender your children. You didn't raise a local parentis in your opening brief. I mean, we were not, we were making it in response to an argument that was raised by the state in its own brief in response to our cross-appeal. So I think we're free in our reply brief to raise the arguments as to why we think what they've said is wrong vis-a-vis those places. But in all of that, I mean, you know, I do think the court has to think about what it is that makes schools sensitive for purposes of analyzing the district court's opinion because the district court did address, I mean, the state has made the argument as to many of these places that the reason they should be prohibited from clearing their firearms is because they're like schools. And so you kind of have to answer the question of what is it that makes schools different so that we can figure out, is a zoo really like a school? Why are you choosing that rather than, for example, that they're vulnerable people, which would apply to things like nursing homes just as well? Sure. I think that, I mean, what I'm focused on is kind of the custodial nature of it. Because I think the problem is, if you just say, is this the kind of place where vulnerable people are present, vulnerable people are present all over the place. I mean, parents take children not just to school, but to – and not just to playgrounds. They take them to stores, to shopping malls, to movies, to restaurants. Now, I know the university has declared all those places presumptively off-limits, but if we assume there actually is a right to have firearms, you can't take, like, anywhere and everywhere that children may be present because, again, it's going to lead you right back to the Bruin problem. Right. So what about places that are discrete places where there's a congregation of people who can't exercise their own right of self-defense? I don't think we've challenged any place that fits into that category. We didn't challenge. Long-term nursing facilities? We challenged healthcare – the way the law is set up, it just says healthcare facilities, including but not limited to a laundry list of lots and lots of other places. We have not said we want to carry every single type of those places, but New Jersey decided to structure the law in a way where that provision is exceptionally overbroad because it just says healthcare facilities. If they wanted to come back – I mean, there's a separate provision that deals just with facilities that treat people for addiction and mental health. We didn't challenge that provision. So if they come back with a narrower provision that's focused on particular types of medical facilities, we might have no problem with it. But when you start from the presumption of, like, look, there may be something in that category that's problematic, so we'll just take the whole category off limits. I don't think that works. It's their burden to show that the way they have legislated is consistent with historical tradition. As the district court noted, there's just no historical tradition whatsoever of saying any facility at which medical care is provided is one that people can't carry firearms. The justification were to be that these places have a concentration of vulnerable people. Does that justification pass the Bruin History and Tradition Test? So I think you'd have to couple it with that kind of custodial nature and some sort of heightened security in the sense of, like – Without that. Without that. Without that, I mean – There's a lot of – like, it's a hospital. It's a nursing home. I don't know. There's vulnerable people. There's a lot of kids around playgrounds. I mean, I guess it's just – what I struggle a little bit with is, I mean, all of this is only going to matter if there's a place that's open to the general public, and so if it's not, you know, we don't have a right to be there at all, and of course we don't think we have a right to trespass anywhere with firearms, and so if you're only talking about the universe of places where, yeah, there's vulnerable people present, but we're perfectly happy for the rest of the general public to be there, too, at their pleasure, and they can engage in any other conduct and exercise all their other constitutional rights, but they can't have a firearm, I think that's problematic, but again, you know, that's – if you – when I look at the law and think about, you know, I mean, there's well over a dozen provisions we did not challenge, and part of the thinking is, you know, in analyzing this law, since it's such a long list, I think the court has to kind of think about how do you put the ones on one side and one on the other, and all the problems arise in the context where you're talking about property that's open to the public, because when you're doing that, you know, you presumptively get to exercise your constitutional rights there, and Bruin resolved the question of whether that includes your Second Amendment rights, and said if you're talking about places where the public generally gathers, then presumptively you get to exercise your Second Amendment rights there, and it's the state's burden to show that there's something special about it that makes it different. So we're talking about the kind of property. Don't we have something of a contradiction in terms where we're looking at a public carry right in private property, and when we think about this default and what the sort of expectation is, why isn't that – there's got to be consent. You agree to that, right? I mean, we agree we can't carry somewhere where the property owner's not willing to let us carry. So without – We don't agree that you have to have express written consent up front, but we agree that we can't carry if they don't want us to. So there needs to be a property owner's consent, and the idea of having the default of that, you know, yes, you can carry seems to be the expectation that that's the way owners in this locale think about people coming onto their property. Is it possible that that's different in one locale than another in the country? So I guess I think that's really not the right way to come at the question, you know, and I want to talk about the history, but I also just want to say the threshold. I mean, you know, we're not just talking about kind of how laws will be enforced in some civil property law trespass context. I mean, the state passed a law that makes it a crime to exercise a constitutional right at a place that is generally held open to the public. If that's not – I mean, the state's arguing that that doesn't even implicate the Second Amendment. By that logic, I don't know why the state couldn't pass the law that says this is a speech-free zone or you – you know, unless the owner gives you permission, you cannot wear religious items inside private property that's open to the general public. Go back to the premise, because I thought you agreed that people – even law-abiding citizens with their permits can't carry a firearm onto private property without the owner's consent. Let me be clear, so maybe I – maybe we're not agreeing to the same thing. I agree that they can't do it over the owner's objection. So – and so, you know, of course you can't do it over the owner's actual objection. But I don't think the state can come in and create a rule that says, we presume they object, unless and until they tell you otherwise. Because, I mean, setting aside the Second Amendment for a moment, I don't know why that wouldn't mean the state could presumptively take away all of everybody's constitutional rights unless and until somebody at the shopping mall says, yeah, we're okay with you, you know, wearing your yarmulke here or wearing your I Love Trump shirt here or whatever it may be. That's a problem. When the state wants to say it's a crime to exercise a constitutional right somewhere that you have a right to be, unless and until that person gives you permission, you know, you need to justify that. And that takes you to the history. But I don't think the history remotely supports what New Jersey is trying to do here. Is the expectation of a given population – is that a fact question? Is that something that, like, say you were to, you know, poll everyone in the state of New Jersey, and 95 percent say my expectation is that when someone comes into my private property, they wouldn't come armed without asking me. Do we think about it in those terms? And would that matter? I don't think it does. I think that that would mean New Jersey – you know, if that were the situation, they should engage on an educational campaign to ensure that the – you know, people run businesses that are open to the public in New Jersey understand that as a general matter, there is a right to carry, but they're welcome to put up a sign or whatever it is and tell people not here, which plenty of establishments do. Establishments do that all over the country. This is how the law operates in most of the states in this country, that presumptively you can carry and the burden is on the private property owner to tell you if you can't, if we're talking about something that's generally open to the public. And that's what is the problem for the state's historical evidence here, because the laws historically that they're relying on were not laws about places that were open to the public. They're laws about enclosed land, improved land. Land that you paid – New Jersey is referred to lands on which you paid property taxes, which was just equivalent to – was the same thing as enclosed and improved lands. And they're also only talking about lands. I mean, it's notable that it doesn't say property, other than those couple that have premises in the post-reconstruction era to laws. And even those, one of them says lands. They typically say lands. They are in laws that explicitly say, you know, this is an act for the better preservation of deer. And then the other part of the title is, and to prevent trespassing with guns. So, they are laws that only apply when somebody is somewhere they're not supposed to be. And what they do is impose a heightened penalty for trespassing if you also have a gun and you're on the land, because presumptively that means you're going to engage in poaching. That is not anything like how this law operates. This law is not confined to lands on which people would engage in hunting. It applies to, you know, the shops, the taverns, the – everything that would have been in town. And there's just no indication at all that these laws that were on their face, anti-poaching measures, were ever applied in that context. And Bruin says, even if there's ambiguity about something like that with the historical law, the tie goes to the exercise of the constitutional right. Is it relevant that this New Jersey law didn't exist until 10 months ago? I mean, I think that's a huge problem for the state that they're trying to come in now and impose prohibitions that are not even consistent with the historical traditions of New Jersey. I mean, even from, you know – for all the reason I just explained, I don't think the state has it right about what the law was in the 1700s in New Jersey. But by 1895, there's no question that New Jersey had expressed notice that you're not supposed to be carrying a firearm. And even then, we're still dealing with, like, lands, not with, you know, laws that are singling out, kind of, shopping malls, restaurants, bars, what have you. So I think it's a real problem for the state to come in after – you know, and to come in right after Bruin said, this is supposed to be the exception, not the norm, and come up with a rule that essentially declares, like, almost everywhere people are going to go, since, you know, most of the places people frequent are going to be presumptively off-limits to carrying a firearm. Is there a principal difference between opening up your private property to the public as a commercial establishment and doing that in your home, where we have a contractor coming in? Is it the same default expectation? And does the law – does this law, in terms of its constitutionality, apply differently? So I think the better answer is that it doesn't matter if you're inviting someone in. That's the presumption. But, you know, I will grant that if you just have – I mean, there's – when Eugenia says there's a lot of states that have laws like this, that's actually not true. The few states that had laws like this before Bruin actually were states that limited to just to residential property. And, you know, maybe for the same reason that the court – the Supreme Court has been a little more welcoming of restrictions on solicitation at somebody's doorstep, which is generally not a place that is open to the public. It's a limited license. You know, maybe you could look at a tradition of these laws and come to a little bit different conclusion as to residential, but, like, certainly not a law that sweeps in as broadly as they do going out of their way to say all private property, including but not limited to residential, commercial, industrial, undeveloped, whatever it may be. So, again, you know, there may be aspects of this law that if they wanted to kind of sit down, roll their sleeves up, and think hard about how do we actually go about this in a way that's consistent with historical tradition in Bruin, maybe you can arrive at some much narrower protections that would be historically permissible. But I don't think they can rescue this law by, you know, suggesting kind of narrower ways or pointing to kind of minor aspects of what they've done in a blunderbuss way that might be permissible if they came about it a bit differently. How much do we defer to the legislatures addressing what they perceive as new problems for their jurisdiction? I mean, if you have – say, hypothetically, you have, you know, one state where if people see someone with a firearm, they panic, and – because that's not the norm for that locality, and all the risks that go along with people being panicked in, you know, in confined to crowded areas, you know, you may have concerns about. In another locality, it's considered the norm, and people don't panic when someone walks into the supermarket, you know, carrying their rifle. Are those legislatures – is that difference in the situation something that we should take into account in evaluating a legislature's attempt to themselves draw on history and regulate to address what they perceive as a new problem for their locality? Yeah, I don't think that that can be a permissible basis to restrict constitutional rights. I mean, the court has in many contexts said, heckler's vetoes are not a basis to say you can't exercise the rights. So if you have a community that, by virtue of some – courts haven't had the law wrong for several decades before Heller came along, people just – and maybe just community norms, people don't really carry firearms. You know, the answer is to educate that community and help them better understand that this is a constitutional right, not to say, you know what, like, the citizens of California are really uncomfortable with the fact that we have a Second Amendment, so it's just not going to apply there. I mean, that's the whole point of having a constitutional right enshrined in the Constitution is to say we recognize that these are things that – you know, there may be times when a majority of people think twice about the fact that we protect them, but they're in the Constitution so that it's not enough to come forward and say a majority of the people are uncomfortable with this because it's a right. And what you need under the Second Amendment, as Brewer made clear, is a historical tradition, and I don't think there's any historical tradition that supports the idea of, you know, community norms sort of allowing greater or lesser leeway to regulate in areas that were protected by the Constitution. The only place you kind of see that is the territories. But if you're in a locality where there's – on a regular basis, there are mass shootings in theaters in particular, would a law that prohibited carrying firearms into theaters in that jurisdiction be one that passed muster in terms of the burden that it's placing and the kinds of reasons that in the 18th and 19th century, firearms were regulated? I don't think so because the historical tradition shows that the response to concerns about a particular place being particularly sensitive and dangerous for the carrying of firearms was to ensure – to actually, like, provide security, not create sitting ducks of all the people who go to that place. And so if a locality said, you know, we've got a real problem at movie theaters, so we're going to install a government – we're going to fund, like, government metal detectors and screening and security at a movie theater, and they start treating them as sensitive places in all of those respects. I mean, maybe then you can at least start to have a little bit different discussion about all of this, but if they're not treating a place as sensitive for any other purpose – they're not restricting access, they're not screening, they're not ensuring that they're not just leaving the people inside it vulnerable sitting ducks – I think that's really inconsistent with the historical traditions of our country. Parks. Your friend says as soon as cities started setting aside space for parks, they also banned guns there – Central Park, Fairmont Park. Isn't that at least the beginning of a tradition? I don't think there's really a whole lot of support for the notion that parks were not common until 1850. A particular type of park started becoming more common then, but our First Amendment traditions are based on the notion that there's been parks and places like that where people gather and talk forever. For time immemorial, I will use a phrase the Court commonly uses in that context. So I think one of the problems here is the same – a similar problem that kind of cuts across all of this. Not all parks are created equal. So, you know, we think there's higher rights here in all parks, but certainly a law that sweeps in both, you know, Central Park, the small neighborhood park, but also the state park where somebody might, you know, is permitted to go stay in their camper for a few nights and you've got a declaration here from the state saying, well, we can't allow firearms there because police might not know when they go to the camper whether somebody's got a firearm inside it. I mean, by that logic, you could ban firearms in the So I think you've got to think about, you know, the state is right that the concept of parks has changed over time, but I think in some respects that actually undercuts their argument. If you go look at what the National Park Service, some of the material that they put in the record about the historical restrictions there, yes, there were restrictions. You couldn't have a loaded firearm in a park. Clearly, that was because they didn't want people hunting in the parks. You could have a firearm. It was sealed, but if you read about the way the law was enforced, it was very clear that if you unsealed the firearm to use it in self-defense against another person or against a wild animal that was actually one you're allowed to shoot, that was fine. They assumed you could do that. So they weren't saying, you know, you cannot have any means of protecting yourself inside the park. They were saying you can't have loaded firearms as a general matter inside the park because you're not supposed to be hunting inside the park. But the Park Service itself in its study that they put in the record said, like, pretty much everybody was actually bringing firearms into national parks at the time. They just had them sealed, and it turned out most of them ended up being unsealed anyway. So I don't think, you know... We're trying to kind of get at whether it be the specific park or the community standards is sort of the idea of if there is a historic tradition of a burden of a how in the how and why, can it be used to address a new why or a new place? I mean, it depends what you mean by new place. If it's a place that didn't exist, like an airplane, you know, that's a new place. And we take old principles and apply them to a new place. But if it's a place that did exist, like a tavern, and nobody ever had a restriction on taverns, and all of a sudden in 2022 people... I'm talking about a new place, a new place or a new problem even, a new why. So a new... Can a historic tradition of that particular regulatory burden be used to address a new place in the new sense of new or a new problem? Certainly a new place. Certainly. I mean, like, I don't think the fact that there's not historical restrictions on airplanes means the government loses the airplanes case. You take the historical principles and apply them. And another principle just, you know, that I think is relevant in that context and some of these other contexts is if you have a place that, like, by its physical nature, the mere presence of a firearm presents a risk, we can see that tradition coming from fire safety laws that prohibited having large amounts of ammunition in particular places where there was a much greater fire risk. I think that same principle would, you know, you can apply it to something like an airplane, where it's not just a matter of, you know, we're afraid someone will misuse a firearm, but a shot of a firearm in an airplane could put everybody, it could put the airplane itself and everybody inside the airplane, their lives at risk. That's an aspect of the place that makes it different. And there's a provision in here that deals with places and with power plants. You know, power plants, in addition to not generally being open to the public, they may well fit into something like that where it's the physical nature of the place that it's not the kind of place that might have existed 200 years ago, but you can draw principles from 200 years ago and apply them. Why isn't that true with the legislature making legislative judgments, for example, in a place like Met Stadium or a nightclub, that if somebody fires a shot, you have a stampede that puts everyone at risk? Yeah, I think the problem is, I mean, that's the Bruin Art, that's New York's argument. Their argument is, look, Manhattan's, like, really crowded, and if people have firearms and shoot somebody there, it's gonna be a big, crazy mess, and that's a problem. Is a confined space, a discreet, confined space different than the island of Manhattan? There were tons of confined, discreet spaces at the time of the founding. I mean, their entertainment facilities date back thousands of years. There were tons of those places, but we don't see laws that say any place that has, you know, kind of one entry and exit point, you can't have a firearm. I just don't think that logic works, because it would sweep in virtually everywhere except outside, and then, you know, the state's going to come in and say you can't be outside either. So you've got to identify something beyond... Is there ever a new problem that can be addressed by a historic tradition of a particular burden, of a particular regulatory burden? I mean, Bruin certainly contemplates the possibility of new problems, but they do have to be new. I think what Bruin says is you can't take an old problem and just say we've decided to regulate it in a way that historically it was never regulated. That's, you know, that's essentially what the court is saying is off-limits and is a real problem, because you're departing from historical tradition. I do want to take, I don't know what time I have, but I do want to talk about permitting a bit. To leave a few minutes for Mr. Patterson or not, I think there's about three minutes left. Yeah, I mean, I don't know how this was... I don't know how far we are into the 80 minutes. 40? Right, but this wasn't set for 80 minutes. 40 minutes. Okay, we were 20, we were 20 minutes, so I think I can take a little bit more time and still leave Mr. Patterson with a good 20 minutes or so. For witness requirement, why isn't it just sort of a variation of background checks? Because what it does is puts a burden at the front. I mean, for one, it puts a burden at the front end. I have to find some people who will vouch for me to be able to exercise a constitutional right. That's a problem in and of itself. I mean, I may have lots of friends who think I'm a wonderful person. If they just don't like the Second Amendment and think people shouldn't get to carry guns, they then get a veto power over my constitutional rights. So I think that's a huge problem, and it's just, it is too discretionary. There's no discussion of what makes somebody reputable. Sure, you have a standard that's ultimately about, is somebody going to be a danger? But I mean, it's an open-ended inquiry into things like, they could sit for an interview and be asked about, you know, do you drink a lot of alcohol on the weekends? Or have you ever said anything? I mean, if there's anything that you've ever said that makes you suspect they might be intemperate, that seems a whole lot like what Bruin was saying when they drew the distinction. I mean, they specifically distinguished between narrow, objective, and definite standards, and things that require the appraisal of facts, exercise of information of an opinion. And they said the latter is problematic, and that's what this snags up. And I don't think it's an accident. Isn't it sort of an attempt to mirror the surety laws, where if you had information that reflected someone might use a firearm unsafely, then more could be required of that person? Isn't it an attempt to sort of capture that idea? It may be the same why, but it's not the same how, remotely. Because the surety laws said, everybody gets to carry, unless and until someone comes in and has a complaint that establishes reasonable cause that you can't. And this law says, nobody gets to carry, unless somebody comes in and establishes reasonable cause to think that you can. And so, you know, the tradition, and Bruin says, the central questions are the why and the how. But it's just part of the background check. I mean, if it's part of a background check, which is part of the tradition of ensuring that the people who possess firearms are sort of of the responsible nature or the law-abiding citizen who is permitted to have a firearm, as it's just part of that. I mean, isn't that already part of the – I mean, New Jersey's good cause requirement was part of a background check. And the Supreme Court held it unconstitutional, via holding New York unconstitutional, because it was not a permissible part of a background check because of the nature of both – I mean, it wasn't just that it amounted to a blanket prohibition. The court went out of its way, and a couple of members of the court who joined the opinion went out of their way to specifically identify as one of the major problems with that legal regime, that it built in too much discretion. It wasn't, have you actually committed a crime? It was, you know, licensing officials have broad authority to kind of investigate whether they think even if you haven't committed a crime, we're a little bit worried about what kind of person you are. I think that's a real problem. And I do think it's particularly problematic to require you to produce the character witnesses up front. If you look historically, the only couple of laws that they've identified that had a character witness requirement up front were invidiously discriminatory laws that either applied to people of a certain race, or they required you to produce freeholders, which really smacks of class-based discrimination. So I don't think, you know, the historical record proves Bruin's point, which is once you have things like character witness requirements, you're just creating way much possibility for, you know, for discretion and for denying people their rights for impermissible reasons. But we have no, you know, we're not here challenging a background check. I mean, there's a background check provision here, and there's background checks that are already built into all this. This is just an add-on that says even if you pass all of that, you have to produce these witnesses. So isn't this the stuff of an as-applied challenge? No, because this is we have to do to get a permit. We have to produce these four people. And if the state is saying we have to do something that we think constitutionally it can't require us to do, I mean, we get to challenge that facially, and there's a facial problem with them demanding this of anybody, not just of my clients. So your argument seems to be that it reintroduces discretion. Yes. And that it becomes an unreasonable burden. Wouldn't that need to be done on an as-applied basis? No, I don't think so. I mean, if you take the Supreme Court's Forsyth County case, which was the case about whether the Nazi party that wanted to have a parade, that was a facial challenge to, and the part of the, they had gone to the county and they'd said, we'd like to have a parade. And they said, great, you can have a parade and you have to pay $100 fee. And instead of accepting that, they sued. They brought a facial challenge. They said, we think the problem with this law is that it gives too much discretion to the permitting official to decide what the fee should be. And the Supreme Court agreed and held that law unconstitutional. And so it's a facial defect in, just as there was a facial defect there, that there weren't boundaries that ensured that the permitting fee wouldn't take into place things, but take into account things like the content of someone's speech. Here, it's a facial defect in this law that it is not, that first, it requires us to supply these character witnesses, and then that it doesn't have sufficient guardrails as to how they can be used in the process. Well, the description is that it's a form with very specific questions that are just for yes or no questions. I mean, the law in its face actually requires a follow-on interview of the people, of the individuals. And it also makes clear, you know, whether there's a form and the form is not built into the law. That may be the way it's been implemented in some respects, but the law doesn't say kind of like, that's all you ever have to do and that's the end of it. So I don't think it's really, you know, that it would be at all inconsistent with this law to demand much more of people than simply signing something. But I still think simply signing something is a problem. Is there anything besides a criminal history check that, in your view, could be done consistent with the Second Amendment to ensure that the permit is going to someone who is a responsible law-abiding citizen? Well, the background check itself takes into account more than just criminal history. It does mental health checks. It looks at, you know, a variety of different databases that are designed to get at not just criminal history, but the objective characteristics that we think about, like mental health history, as being problematic for purposes of people having a firearm. So, but I do think you need that, you need to have the guardrails of something that is objective, not just kind of the discretionary, I've taken a look at you and I'm just a little bit worried that you might not be the kind of person who should have a firearm. You know, if that's what you think, then you should only be applying a standard like that in a context where it's because you think somebody is actually, you know, about to commit a crime or not of safe mental health, in which case you should be doing a lot more than just saying you can't have a firearm. If I can, I'd like to talk a little bit about the financial conditions as well. And, you know, as has been discussed, starting with the $50, I mean, it is correct that our challenge here is not about the amount, it's about the nature of the fee, and that it is by the terms of the statute, not something that's being used to regulate the law-abiding conduct of the citizen who wants to carry their right to carry a firearm for self-defense. By design, it is saying if you want to exercise your right, you have to compensate the victims of criminals. That is essentially treating people as if they are responsible for criminal activities for no reason other than because they would like to exercise a constitutional right. I think that's exceptionally problematic, and it doesn't matter that, you know, maybe if the state wanted to have some sort of different fee that collected the same amount of money and justify it as some other grounds, if they really could show that $200 is offsetting the cost or, you know, I mean, the laws that they point to are just personal property taxes that are general codes of all the personal property that's taxed, and firearms are included. We're not arguing that there's no way the state can tax or impose fees on constitutionally protected conduct, but it has to do so within the guardrails that are established in this context and every other, which is you can't be saying... Ms. Kai's argument that part of the activity, the permitted activity, is not necessarily because people are acting unlawfully, but just by the nature of the activity, an increased police presence, increased police force will have to be funded, and that it therefore is part of the maintenance of the permitted activity. Even if that argument were right, at most it would justify $50 toward an extra police fund. It wouldn't justify saying you have to pay the victims of crimes. That is not police activity. That is compensation that normally can only be imposed on somebody who's convicted of a crime or, you know, has a judgment against them for liability in court. You don't take the innocent person and say you have to compensate someone else's victim just because... I mean, you don't do that in any context. You certainly don't do that solely because they want to exercise a constitutional right. So I don't think for... Is it badder that their argument is that it's sort of a fiction, that it goes to the victim's account, that it really just goes to the coffers? No. I think you have to take the state law as it comes to you, and it literally says right on its face $50 is to be set aside to go to the victim's compensation fund. So I don't think arguing, well, we could have done it differently or maybe we won't follow that and we'll put the money somewhere else. That doesn't matter. This law, on its face, requires my clients to pay $50 to crime victims if they want to exercise their constitutional right to carry a firearm, and that is problematic. If the state wants to pass a different law on a different justification, we can have a discussion about that in the next case. But I think for purposes of this case, the law that they have enacted has a real problem with the $50. As the insurance liability mandate, I think you arrive at the same basic problem, which is it's treating everybody as if they're a front-end liability risk before they've done anything wrong and saying you have to essentially go and insure against the prospect that you'll misuse your constitutional rights. There's just no historical basis whatsoever for doing that, and I don't think the state can excuse that by saying insurance is a novelty. For one thing, insurance is certainly not a 21st century novelty, yet this mandate is the first state mandate of its kind in history, so that wouldn't explain why nobody was enacting these for the past century. But even setting that aside, the surety laws are a historical analog here. The problem is they point in exactly the opposite direction because the how of the way that those laws operated was not to say everybody who wants to carry a firearm must pay a surety. It was to say if and only if there is reasonable cause to that you are actually not going to just carry a firearm for self-defense but are going to harm somebody or are going to otherwise breach the peace, then we can require you in particular to pay a surety. But what this law does is flip that on its head and say our reasonable cause to think that you're going to engage in impermissible conduct is the fact that you came forward and said you'd like to exercise your constitutional right to carry arms. Does it matter what the premium is which I gather we don't have in the record? I don't think it does. The flaw in this is the design, so obviously it would be even more problematic if it was completely, completely unaffordable. But even so, I think it would still be a problem even if it was pretty easy for people to get to this insurance, which in reality is not going to be true. Why isn't the history, I think it was sort of articulated along these lines in one of the amicus briefs, just a matter of looking back at the evolution of tort liability and going from strict liability if there was harm, negligence, the rise of tort liability, and then insurance that was dealing with that liability that there's always been, in other words, a need to compensate a victim. And it's sometimes the case that a defendant in a suit like that doesn't have the means to do so. That's absolutely a societal problem, but I mean, tort principles haven't evolved to such a point that we require everyone in the country to carry umbrella insurance just because we assume they're all likely to commit a tort sometime. There are costs that will be uncompensated, but the way we deal with those is by spreading them equally among everyone in society. So if New Jersey wants to raise additional money to put into the victim's compensation fund through a generally applicable tax, great, have at it. But what you can't do is say, here's how we're going to address this by making people shoulder a disproportionate burden of the cost of wrongful conduct for no reason other than because they have expressed an interest in- Why is the right analogy to motor vehicle insurance? Because there's not a constitutional right to drive a car. But if we agree that there's a history that goes to compensating victims, even for negligence, not purposeful wrongful conduct, where we have firearms that, like automobiles, can easily inflict significant injury, why isn't that the current how, that is, insurance, you know, with an insurance premium addressing a similar problem to the way tort liability has handled that compensation in the past? I mean, we haven't evolved to such a point where we treat everybody as liable for the acts of wrongdoers. And automobiles is the exception, not the norm. It's one of the only contexts in which people have to have insurance. And again, it's not a constitutionally protected right. And so, particularly in a universe where the court in Bruin said about 16 times that it is the state's burden to prove a historical tradition. And the only historical tradition that exists here is a historical tradition of imposing those costs on the wrongdoer. I don't know how they can come along and say, you know, I mean, societal norms have evolved to such a point that we think that we should actually make law-abiding citizens pay for the acts of criminals. And the reason we're going to single them out is just because they want to exercise their Second Amendment rights. I don't think that would fly in any other context. And it certainly isn't supported by any historical tradition. With that, I will see things to Mr. Patterson. I think it's now good afternoon, Your Honors, and please accord Pete Patterson to the Coons plaintiffs. I'd just like to start by saying a key kind of paradigm shift that needs to take place with respect to New Jersey and the mistake here is that the actual social change that the state is trying to address explicitly in this law is the exercise of Second Amendment rights. Now that Bruin has been decided, the law explicitly said we need to change the law because there's a likelihood that a much greater number of individuals will now qualify to carry handguns in public. So that's expressly what this law is reacting to. And it can't be that now that people are exercising Second Amendment rights, somehow these places that have never been considered sensitive before now somehow are all of a And in terms of how we analyze the how and the why, the burden, Bruin is very clear that we look at the how and the why the law burdened law-abiding citizens. So the perspective is from the law abiding. So if you have a question of now, for example, if firearms are more lethal, well then making a place where law-abiding citizens can't carry firearms, that is a bigger burden on Second Amendment rights and the right to self-defense now than it would have been at the founding. For example, if say I'm facing 1791 firearms technology or 2023 firearms technology and you're saying I can't have firearms in one of those circumstances, well the burden is going to be bigger now. So that's the relevant social change where the right is actually more important. And that is how Bruin actually treated that language. It distinguished the 1686 law that New Jersey actually relies on here with respect to planters and handguns and said, well maybe handguns weren't in common use then, but they're in common use now. So that's not a valid analog. So if anything, the social changes can take a law that on its face looks analogous and break that analogy by saying the burden is no longer the same. And with respect to, and this is really tied. Does a proliferation of firearms, the change when there was mass production toward the end of the 19th century, even putting aside anything current, does that create any new problem that the legislatures may address? Well, they may address it. For example, there were a lot of laws saying you can't carry concealed. We have no issue with that. You have to carry open. The state could do it either way. But with respect to if you look at the how and the why, if the issue is okay, there are more firearms now, they're being more mass produced, they're more legal. From the perspective of the law-abiding citizen, if you say you cannot have a firearm because of that, you're putting them at a higher risk. So that is not something that the state, it can't be that well now there's a greater danger from misuse, from criminals, so that we're saying that now we have to have greater regulation. No, it's actually the opposite. The law-abiding citizen, it needs more protection, not less in that circumstance. And that's why we think the provision of government security is so crucial here, because that matches both the historical record and the burden on Second Amendment rights. Because as a matter of history, the three locations Bruin explicitly singled out, as we showed on 24 and 25 of our brief, those are places that had heightened government security. And the reason, the burden on the Second Amendment right is not the same if the government has taken on that responsibility. But it can't be the government just says, okay, we're deeming this place a sensitive place where guns are allowed. It's that the government has to actually ensure that there are not guns in that location. So if there's a county courthouse that doesn't have security, in that situation, someone can carry a courthouse? There could be an as-applied challenge. And there actually were at the founding, as the other side points out, some laws in some states requiring firearms in places like courthouses. So if the government is not providing security, then it is a big imposition on the Second Amendment right to say that you cannot have a firearm in this location. Because as a matter of reality, this law only matters to law-abiding people. If it's a criminal that is willing to come in and commit some sort of atrocity, they're not going to care that there's an additional, you know, maybe a few years tacked onto their sentence because this is a gun-free zone. In fact, it may attract them more to that location. Do you have concern on the part of the state that law-abiding citizens, when they are excited or agitated in, for example, a sporting event, or if they're intoxicated at a bar, that even law-abiding citizens who are armed may pose a safety risk to each other or to other patrons? Well, with respect to intoxicated people, we don't – we're not saying intoxicated people have a right to carry. That's a separate tradition of someone who – I think a lot of this goes back to the afraid tradition. If there's a reason to believe that the person would misuse firearms in a terrorizing manner, then that person can be regulated. But as the common law also said, you can't just have the bare possession. Because there's – this is the Tennessee Supreme Court said in Simpson, similar to the North Carolina Supreme Court in Huntley, the mere fact that you possess a firearm can't be held to cause that sort of reaction because we have this constitutional right. With respect to the stadium, again, if the government really believes there's a problem with firearms at stadiums, then it can put metal detectors at every entrance and screen people when they come in and ensure there are no firearms in that stadium. If they did that, we would not have an issue with it. What about places where the private security already exists, like casinos with their – always have high security due to the vast amounts of money going in and out? If a place like that already has its security and the government says, plus there's this excitement, there's a high degree of intoxicated patrons, high potential for conflict, and the security is already there as a matter of practice, how does that affect your analysis? I think it's got to be the government that's providing the security. But this does not override the ability – for example, the casino, if they said we don't want anybody with guns in the casino and we're going to ensure – and this is what private entities do, privately-owned stadiums, for example, that don't want – You said it has to be the government. Yes, because otherwise it's not guaranteed to be there. The government has got to guarantee that that security is present in that location. But this does not – again, if the private location says we have our own security, we don't want any firearms in this location and we're going to ensure that doesn't happen, the private entity has every right to do that. So as a matter of fact, I don't think it's going to make a tremendous amount of difference. And the good thing about this test is it's similar to what Heller said with respect to handguns. It said there might be a lot of reasons why people want handguns as self-defense. You can hold the phone in one hand and your handgun in the other hand, or they're easier to manipulate, whatever, but whatever the reason, law-abiding citizens choose them so they're protected. And it's similar here. There may be many reasons why a given location is sensitive. Maybe a lot of crimes have occurred at that place. Maybe there are democratic deliberations or it's a courtroom or it's something that's a high stakes that is happening there. Maybe it is like an airplane where if somebody fires a firearm, even legitimately, it could cause a problem with the airplane. But whatever the reason, the government has to actually ensure there are no firearms in that place. Because again, it's – the law – this law only makes a difference with respect to the law-abiding because the non-law-abiding are not going to – are not going to care what this law says if they're willing to commit much greater crimes than the ones that are prevented here. The state says that places where people are vulnerable, firearms can be banned on similar reasoning. That is actually gets things backwards. If there are vulnerable people, there's a greater need for self-defense if the state is not providing security. And Bruin is actually very instructive on this because Bruin mentions schools, but the history in schools, Segal Council has indicated, is connected to the in loco parenthesis authority. And if you look at historically around the founding to the extent there are restrictions in schools, they were on students, which the schools had in loco parenthesis authority. But Bruin – It's not universities. I mean, there are plenty of universities. At the founding era, universities had in loco parenthesis authority over students. They do not now. So that would no longer justify a restriction. So that is another changed social circumstance where that social circumstance has changed. So now the rights have expanded to match that changed social circumstance. But Bruin in discussing – One explanation for schools. Don't we from University of Virginia from the board meeting where they come up with their regulation with a couple of founding fathers who were present for that? Yes. And they had in loco parenthesis authority over the students. It only applied to the students, and that's why they could do it. It's because they had that authority over the students. Their articulation was to enable them, in so many words, to focus on studies. Yes, but it applied only to the students. It would have not applied to Thomas Jefferson coming onto campus. It was only to the students that that applied. And Bruin is very instructive on this because in giving an example of why the Second Amendment continued to be important in the reconstruction era, one of the examples it gave was that teachers in Friedman's Bureau schools were arming themselves to protect from racist terrorism. So that just puts into sharp focus the point that in areas where people are vulnerable, the Second Amendment is more important if the government itself is not providing that protection. And that's how Bruin itself treated that issue. There's been an issue raised with respect to the parks, and the state is saying that the parks in the 19th century, this was a new thing. If you actually look at the source, the state sites, which is this book about Central Park, it's very interesting. And it's not that parks were new. It's that there's a specific sort of park where they wanted to create kind of an European aristocratic environment within the cities to get away from places like Boston Common, which the National Park Service report that the other sites in reply says was a place for recreation since at least 1660. And they wanted this to be a place kind of separate from the J.A. There were gatekeepers. There were, yes, no firearms, but there was also no indecent language in the parks. And that was also went through into a lot of these other parks that followed in that stream. So that is an anomalous. That's not part of our traditions. That's not how our parks operate today. And so that was an anomalous situation with respect to those parks. So we should not be looking to those parks to establish our constitutional tradition. Could you address, is there just one tradition and is there any room at all for the different states to have different laws in particular places of concern to citizens of that state? Well, I think those are two different questions. So I'll answer first the question about is there just one tradition? And I think the answer is that yes, there is just one tradition as a constitutional matter. That is what Heller, when it's discussing the Second Amendment, said it's a pre-existing right. There was some Justice Stevens, I think, was citing some language in some ratification proposals. And Heller said it's dubious to look at that language because this is a pre-existing right that we're looking at that had an understood scope and application at the founding. So the Supreme Court has said there's one tradition. And I think the court's job here is to say, okay, what is part of the genuine tradition and what are outliers? And separating that from that chat in terms of the historical laws. And that's why I think the common law is actually very important because that was generally applicable. And as it was understood in America, the kind of sole common law restriction on carrying in public was this common law of fray, which said that, which Bruin made very clear by the time of the founding, it was not understood to generally bar public carry, but only when it's associated with circumstances apt to terrorize the public. So circumstances that would make people think you were going to misuse the firearm. And what the case is, Simpson and Huntley said, it's a simple fact of carrying a firearm, particularly when you have a constitutional right, cannot be held to create that sort of terror. But what also, and I think my counsel for Siegel pointed this out, is that the statute of Northampton and analogs, which codified, were held to just simply been a codification of law of a fray, singled out courts and other places where people could not carry, except for their associates and ministers of justice, so there's an expectation that there's security. And then all the other places that are listed there, this is the fairs and the markets, that is only if it's done in a manner to terrify. So already that separation between places that provide government security and places that do not is in the law. So then with a particular location, and they say, okay, to address this, we need to treat that place as sensitive, and we need to make that a gun-free zone, and we're actually going to do it. We're going to put people there. It's a place that is securable, a discreet location. We can have controlled egress and ingress. We can ensure everybody coming in with metal detectors does not have a firearm. Then that state can make that place a sensitive place. So a school can't be a sensitive place unless there is metal detectors at the doors? Correct. Under the tradition, the students over which the school is in local parentage authority, the school could restrict the students from having firearms. With respect to other people, as co-counsel said, the school could say other people can't even come into the school. People don't have a general right to come in and out of the school. So the school can do things like that. But to make it a complete gun-free zone, yes, the school would have to ensure that there's actually no firearms there. Can you think of any current examples where the government has done that in new places? Here today. I mean sort of new places. Yes, airplanes. Airplanes are a perfect example. Those places didn't exist at the founding, but the government has ensured that people do not have firearms on airplanes, and we do not have a problem with that because the government has said, yes, you can't carry a firearm, but we're going to ensure that nobody else is going to be able to either, except for whatever law enforcement that is there. So I think that really is the through line with respect to the three sensitive places that the court identified in Bruin and to what would make a place a sensitive place today, and it also makes sense in terms of what the Second Amendment is meant to protect. What's your reasoning to conclude that all of the statutes that 19th century generally, but the talk about places like ballrooms and fairs and race courses and social gatherings, public assemblies, that all of those legislatures were enacting unconstitutional laws? Well, they are outliers geographically isolated. So there is nothing, maybe there's a municipal regulation, but in terms of state or territorial laws, there is nothing like that before the enactment of the 14th Amendment. So even if you were a judge sitting in 1868 when the 14th Amendment was enacted, we're trying to interpret the Second Amendment and look historically, there is nothing of that nature. And Bruin is very clear, a tradition that starts after the adoption of constitutional right cannot create a historical tradition. And there are also very few numerically. That's not quite right. Doesn't Bruin go out of its way to say that the court has assumed that in some cases, but it recognizes that there is an active debate and scholars like Aquil Amar who were saying it evolves. Well, it's the right time to look at is reconstruction. I'm saying even if the date was 1768, all of those restrictions on ballrooms, et cetera, were after 1868. So there was nothing by 1868. And so those were all after. And so you can't have that tradition is a departure from the historical tradition. And plus in Espinoza, the Supreme Court said we had more than 30 states in that timeframe, creating no aid to parochial schools laws. And they said, that's too late. You cannot create a historical tradition that does not have grounding in the founding. So we think 1791 is the right answer because what is being incorporated is the second amendment. The second amendment was adopted in 1791. So it retains its meaning when it's incorporated, but even putting that to the side, all these restrictions, there are very few of them. They are after the 14th amendment. They're not before. And they're also a departure from what was the historical example, which again was the law of fray, which was if your carriage is accompanied with something indicating that you would misuse the firearm, and those statutes were a departure from that. So they depart from what the historical tradition was. And also if you look at the court cases that address these, I think only one of them actually, most of the language that the other side points to was dicta, was not critical to the case. But almost all of these cases assumed that the second amendment was a militia right, at least with respect to the right to bear arms. So they're analyzing it in a way that Bruin has said is incorrect. Are you saying that Bruin instructs us to reject examples after 1868? If it is a departure from what came before, yes. And our position would be if it's after 1791 and it's a departure from what came before, you would have to reject that. But at a minimum, if the question is what did the right mean in 1868, things that come after that are a departure from anything that came before cannot inform the right. And those particular places, I think the Reconstruction era South is a particularly poor place to look to define it. We would say, okay, we're going to find our voting rights by what they were doing in Texas in 1870. So I think it's a particularly poor place to look to define our rights. And also, it's interesting, even the government protection comes up in one of those cases, the Hill case from Georgia. The case actually was about carrying a firearm in a courtroom, so we don't have an objection to that. But what the court says is that the people are met there and it is the high constitutional duty of the state to protect them in that location. And so under that rationale, if the state has taken on the duty to protect individuals in a place, in this context, by ensuring they're saying, okay, you cannot have a firearm, but we're going to make sure nobody in that location other than law enforcement personnel is going to have a firearm either, then the burden on your right is reduced. Is there a particular number that we need to have a tradition? I don't know that there's a particular number. I think the question is, particularly with respect to legislation, because almost by definition, legislation is departing from the common law, the question is, okay, we've got four statutes, we've got six statutes, are these consonant with what that widespread tradition was, either at the founding or 1868, we think it's the common law to say, is that a departure from that or is that a continuation from that? So with respect to the courthouses and the legislative assemblies and polling places, because those places were secured, they were consonant with that tradition. But then if you look with respect to ballrooms and other places of assembly that are not secured, they are not consonant with that tradition. So it's not that those, a few number of laws were creating the tradition with respect to polling places, et cetera, it's that they were part of a broader tradition. But the same cannot be said for these laws that the state has pointed to where they've got, you know, one from 1853 and one from 1903 and nothing else that's like it. So I see my red light is on. We've all been up here for a long time. So I'm happy to answer any other questions, but if not, ask or confirm. Thank you. Thank you. Your Honor, this case is primarily about history. And what I've heard from both Mr. Patterson and Ms. Murphy is ahistorical entirely. They have nothing to say about the fact that the very statutes that Bruin relied on to glean a history and a historical tradition of sensitive places at courts, at polling places, at schools, also enacted the very provisions that Chapter 131 has today. And so I think that is how you resolve this case. It is entirely consistent with Bruin's teachings. And I'd just like to hit on some very specific aspects of history that were mentioned. The first is about security. So both counsel for Siegel and Coons talked about how security is the rationale and what they had in mind are armed guards provided by the government. So if you wanted to make a daycare or a sensitive place, the government would have to have someone there preventing anyone from walking in with a gun. I think that is entirely ahistorical. That is not what legislatures had enacted when they prohibited firearms at ballrooms in New Orleans in 1816, at fairs and markets in Virginia in 1789, at literary gatherings in Missouri in 1874. And in fact, if that is the rule that Bruin really wanted, I don't think it would have called it a sensitive place provision. It would be a secure place provision or a government security provision. That's just not what it is. And all of the – and I didn't hear Mr. Patterson talk about their historical evidence because none of the sites that he provided to this court actually suggested that courthouses, legislative assemblies, or polling places had armed security. Those were provisions that made sure that the constable was paid for bringing in the jury, for executing a summons, and to conduct the election itself. And so it is not consistent with the historical tradition. And in fact, we know that polling places, for example, did not have historically or today generally armed security and they would not be able to do so. But I heard a little bit of a contradiction as well as to what is – what does make a place sensitive. Ms. Murphy said, you know, if they are gathering for purposes of democratic activity, then that does make it sensitive. And I heard Mr. Patterson resist that by saying even if it's a municipal courthouse, if it's not secured, then you can't make it a sensitive place. I think the fact that they are – I would agree with Ms. Murphy that at least as with some sensitive places, what the government was looking at was the fact that they were used for places of exercising important rights for democracy, such as the courthouses and legislative assemblies. The same is true for public assemblies that are prohibited in Chapter 131 as they were in the very Georgia 1870 statute cited by Bruin through the article and discussed in Hill versus State, which Mr. Patterson talked about at length. What he didn't tell you was that Hill, which relied on Nunn versus State, which Bruin accepted as the rule in Georgia that you couldn't prohibit public carry generally. Nonetheless, in Hill, the court just a few years later said the right to go into a courthouse and peacefully and safely seek its privileges is just as sacred as the right to carry arms and we cannot compel a visitor to, quote, mingle in a crowd of men loaded down with pistols. That is the kind of rationale that is grounded in history and that supports the same statute that we have today. So where is the limit? We know that it's – that the thread can't be that it's simply a crowded place. So if it's this idea of the public assembly exercising important rights, does that extend into a protest in the street? Does it extend to a farmer's market where they have a permit to gather there? And how does that extend to something like a film set on a street? Your Honor, I think the history provides the limit. And the history did not provide that anywhere anyone might be exercising First Amendment rights is a sensitive place. Instead, it looked to locations that are designed for the purpose of exercising those rights. So that is the difference between anybody wearing a T-shirt on the sidewalk versus a permitted assembly that turns that location into the specific purpose of exercising those rights. How does a film production set fit into that? I actually don't think the film production issue is really properly challenged, so to speak. As the declaration of the Film Motor – Motion Picture Commission explains, what film sets do if they're on a public location is that they get a permit from the town to make that part of the sidewalk, for example, off-limits to private citizens. And so people are – their clients are more than welcome to watch as long as they don't set foot onto this place that is now temporarily private. Like, people can't just walk through a film set if they have a permit. So I don't think that's actually that issue. If it's already closed and they're allowed to watch, what does the law accomplish? I think what it accomplishes is actually the people who are permitted to walk on set, such as extras and people like that, to prevent them from carrying firearms in those situations. But how does that fit into the sort of core First Amendment rationale? I don't think the film sets necessarily have to fit into the core First Amendment rationale. I think they probably would be analogous to the prohibitions on firearms at circuses, exhibitions, and ballrooms, and theaters, and things of that sort. But putting that aside, Your Honors, I think the core of this is that the legislatures, not just in territories and not just in the Reconstruction South – although in the Reconstruction South, during eras of radical Republican rule, to try to protect the rights of people like voters, like people seeking privileges of the court, prohibited firearms at places like schools specifically. Your Honors talked about the university restrictions, but I also wanted to make sure that Your Honors were aware that the very statutes that we cite – Texas in the 1870s, Missouri in the 1870s as well, Vermont in 1891 – prohibited firearms at schools writ large. And there is no in-local parentis rationale given. In fact, in cases that upheld the Texas statute, Alexander v. State – this is 11 Southwest Reporter 628 – this is a Texas appellate decision from 1889 – said that a teacher does not have the right to carry at schools. And so there is not an in-local parentis rationale. If there were, I don't think the Supreme Court would have thrice called it a sensitive place provision at the schools. It would have been a student exception or a parental exception or something like that. And so I think that's very important. I would like to just make one more comment on the upshot of their argument. The upshot of their argument is that the very provisions that legislatures enacted in 1869, 1870, 1874 – the moment when they became bound by the Second Amendment right to bear arms via the Fourteenth Amendment – those were all unconstitutional. That's what Mr. Patterson and Ms. Murphy's position would have you believe. I think that is entirely ahistorical. That is obviously illogical, but also contradicted by the court decisions that reviewed those decisions. If I may say a couple things, just clarifying some of the record. They didn't understand themselves as bound until incorporation, right? I don't actually think that's quite right, Your Honor. So one example is Tennessee. So Bruin talks about Simpson v. State, which is an 1833 decision, which understood that Tennessee itself had a right to bear arms that is an individual right. It said you can't ban carry in public generally. You must allow some form of carry. Andrews v. State, 40 years later in 1871, adopted the same provision as understood that Simpson was binding and nonetheless held that the provision in Tennessee that prohibited firearms in certain places, such as race courses, et cetera, was constitutional. And in fact, the reason for it is because people do not have a right to go among the people in public assemblages where others are likely to be affected by its conduct, and that is specifically what it looked to. I talked about Hill. Hill does have some language about the militia right but also mentions none, which the Supreme Court in Bruin referenced as one of the paradigmatic examples of understanding the Second Amendment right. So I don't think that those courts were operating under this false assumption of what the right protects. On references, I just want to make sure that we are clear on one thing. We did not challenge the district court's injunction as to in-person interviews of the references. So what people can do or what the licensing authority can do is if the information is unclear or it's outdated, they can call the person perhaps to verify information the same way you would do in any kind of background check, but we're not suggesting that there's some free-ranging interview. And I would note that the cases that were cited in terms of the First Amendment and Enforcement Act and things like that, there's no allegation of chill in this case. No plaintiff says, I wouldn't be able to get for people to sign this form for me to say that I'm not going to cause harm to myself or others. And I would also note that I don't think that this court has ever applied the overdraft doctrine outside of the First Amendment. Finally, on insurance, I just want to make a couple observations. The first is that I don't think this is a, I think Ms. Murphy acknowledged, their challenge is not based on the cost or the ability to obtain. Rather, it's just, as the plaintiff said in their declarations, they don't want to obtain the insurance. And I do think this is where we truly disagree about the first- Well, some of the declarations said they had policies that the state argued covered the conduct. And in fact, they didn't and or it wasn't up to the limit that the state required. That's correct. But I don't think either of those plaintiffs alleged that they would not be able to afford upping the coverage to the level necessary. So they do not make a impossibility where I couldn't afford it or I wouldn't be able to get it. It's very much the statement they made where I do not want to increase my coverage. Is that a standing argument or is that, are you talking about- It's not a standing argument, but it is a, we'll call it a Bruin step one argument with respect to what is covered by the Second Amendment's plain text. I think what plaintiffs are suggesting they have is a right to not be on the hook or be insured against the cost of harm that they may cause by accident. And I don't think that the Second Amendment provides that. Where Ms. Murphy and I disagree is that I think it is a truism. And I think I learned this in the first day of torts in law school. Everyone is a potential tortfeasor. Everyone has the ability to cause accidents. And so that is what the insurance scheme is responding to. And the fact that it applies to every person who carries firearms in public, it's just the modern understanding of what inherent risk that we carry when we drive a car, when we bring a loaded firearm into the public space. And so the fact that historically legislatures were unable to precisely calibrate what it is that they can impose as an upfront cost to ensure that victims are compensated, the fact that they didn't have the financial technology of liability insurance, which did not exist until the 20th century, doesn't mean that the goals of the surrogacy statutes and the strict liability statutes were not trying to accomplish the same thing. And Bruin says we can use modern innovations if they are trying to get at the same how and the same why, which exactly is it. If it's calibrated in such a way that the actual premium is burdensome, would that be a violation? I think someone could bring in an as-applied challenge. I would think that if you're talking about someone who is uninsurable, I would imagine that person may have other problems in terms of proving that they have a Second Amendment right to carry without risk. They're so likely to cause risk to others. But that's not what we have here. It's a facial challenge. No plaintiff suggests that they would be unable to obtain insurance. And in fact, as the declaration of the insurance expert that we put in the record suggests, many people probably would have it today if they have homeowner's insurance or a renter's insurance. They may have to up the level. That's true. But the cost of that is not an issue. And there may be in development a market for this. The provision has never been in effect, so we don't know what that would be. And I would just like to clarify that the insurance provision is not the same at all because it covers accidents versus the executive order the governor issued in 2020, which is to prohibit the kind of insurance that is for people who have committed crimes. And that's not covered by regular liability insurance, of course. No insurer would cover that. So I just wanted to clarify that. Okay. We'll give you 30 seconds to wrap up. Thank you, Your Honors. I think what we have here is a question of what the history shows. And I think that what the state has shown is that throughout the period that is most critical for understanding the constitutionality of Second Amendment provisions, that is 1868 when the states ratified the 14th Amendment. But even before that, the history that even plaintiffs cited, the statute of Northampton, which equally provided for the same provisions in fares and markets as they did for courthouses, all support the longstanding tradition of New Jersey's regulations. So for these reasons, we ask that the court reverse the injunctions and affirm as to other respects. Thank you. We thank counsel for a really superb argument, briefing and arguments today. And we will keep the case under advisement. We will ask with this case as well that a transcript be prepared and the cost shared. Thank you.